**In re INTERNATIONAL BUSINESS MACHINES CORPORATION SECURITIES LITIGATION.**

**This Document Relates To All Actions.**

Nos. 92 Civ. 9076 (JSR), 92 Civ. 9216 (JSR), 92 Civ. 9301 (JSR), 93 Civ. 0054 (JSR), 93 Civ. 0095 (JSR) and 93 Civ. 6122 (JSR).

United States District Court, S.D. New York.

Feb. 3, 1997.

Jules Brody, Patrick K. Slyne, Stull, Stull & Brody, New York City, Joseph H. Weiss, David C. Katz, Weiss & Yourman, Linda P.

Nussbaum, Goodkind Labaton Rudoff & Sucharow LLP, New York City, for plaintiffs.

Evan R. Chesler, Richard W. Clary, Keith R. Hummel, Cravath, Swaine & Moore, Robert A. Wallner, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

The Court grants the motion for summary judgment of defendant International Business Machines Corporation ("IBM").

The following undisputed facts are pertinent. In 1991, IBM suffered the most negative results in its 80-year history, culminating in fourth quarter losses of $4.95 per share. *See* Def.Exh. 4, at Inside Cover & 30 (1991 IBM Annual Report). The first three quarters of 1992 brought further bleak announcements of multi-billion-dollar "restructuring charges," massive layoffs, downgrading of debt, and other bad news. *See e.g.,* Def.Exh. 30 (IBM Press Release 9/29/92); Def.Exh. 13 (IBM Press Release 3/4/92). Nevertheless, IBM management repeatedly proclaimed that the company had no plans, nor foresaw any need, to reduce its customary quarterly dividend of $1.21 per share. *See, e.g.,* Def.Exh. 4, at 6 (statement of IBM Chairman John F. Akers in 1991 IBM Annual Report); Def.Exh. 52, at 5–6 (statement of IBM Chief Financial Officer Frank Metz). Since IBM's strong dividend was a mainstay of its market position, such pronouncements presumably bolstered the price of IBM stock; but they appeared warranted, as the IBM Board of Directors continued to declare the $1.21 dividend for each quarter of 1992. *See* Def.Exhs. 10, 19, 26, 68 (IBM Board of Directors Meeting Minutes).

Following declaration of the fourth quarter dividend on October 27, 1992, IBM comment on the future of its dividend ceased. Growing market skepticism about IBM's continuing ability to maintain the $1.21 level of dividend—skepticism publicly voiced by prominent market analysts as early as February, 1992, *see, e.g.,* Def.Exhs. 12, 15, 17, 40–41, 44—now went unchallenged. Then, on December 15, 1992, IBM announced that it was "unsure of its ability to maintain the

dividend at current levels" into 1993.[1] Def.Exh. 130 (IBM Press Release 12/15/92). The same day, the price of IBM stock dropped substantially. *See* Steven E. Livingston, "Stocks Slip as Investors Bash IBM," *Wall St.J.*, Dec. 16, 1992.

The next day, December 16, 1992, the first of the class actions consolidated into this litigation was filed.[2] As subsequently incorporated in the Consolidated And Amended Class Action Complaint filed February 26, 1993 (the "Complaint"), plaintiffs, consisting of all purchasers of IBM securities between September 30, 1992 and December 14, 1992 (the "class period"), alleged that IBM's management knew by the former date what the company announced on December 15 and that, accordingly, public statements made by high-level IBM executives between September 30, 1996 and October 15, 1996 reconfirming the prior company announcements regarding the dividend level were false or materially misleading. Complaint ¶¶ 20–23, 34.

■ Now, however, after extensive discovery, it is clear beyond genuine dispute that these later management statements were neither false nor misleading, nor otherwise actionable.[3] To begin with, management statements about dividends come qualified with the inherent limitation that the declaration and determination of dividends are historically the prerogatives of the Board of Directors. *See, e.g., Burton v. Exxon Corp.*, 583 F.Supp. 405, 415 (S.D.N.Y.1984) ("A decision to declare a dividend is a matter ordinarily addressed to the discretion of the board of directors."). In the case of a New York corporation such as IBM, these limitations have the force of law, for New York prohibits its corporations from guaranteeing dividends, *see Lindgrove v. Schluter & Co.*, 256 N.Y. 439, 444, 176 N.E. 832 (1931), and instead directs each company's board of directors "to exercise an impartial judgment in reference to the declaration of dividends, and to declare them only when, under the existing circumstances, a declaration will seem best to serve the corporate interests." *Id. See also Kennedy v. Kennedy*, 22 Misc.2d 924, 91 N.Y.S.2d 294, 304 (Sup.Ct.1949) ("The declaration of dividends rests in the uncoerced discretion of the Board of Directors at the time of declaration or refusal to de-

1. On January 26, 1993, IBM declared a dividend for the first quarter of 1993 of $.54 per share. Def.Exh. 132 (IBM Board of Directors Meeting Minutes 1/26/93).

2. In this rush to the courthouse, one can only wonder at how fully the dictates of Rule 11, Fed.R.Civ.P., were complied with. Some four years later, at oral argument before this Court, lead counsel for the plaintiffs candidly volunteered that the lawsuits might well have been subject to dismissal at the outset. Tr. 12/5/96 at 106.

3. It follows that the Complaint's fall-back theory—that, as a result of expectations created by earlier management statements, IBM had a duty to warn investors by September 30, 1996 of the growing threat to the dividend (*see* Complaint, at ¶ 34)—must also fail. *See generally, In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 516 (9th Cir.1991). As for plaintiffs' strained attempt in their summary judgment response papers to craft still a third, and wholly independent, theory of liability premised on IBM's alleged overstatement of third-quarter earnings, this must fail as well. The new theory must be rejected on the merits, since IBM's stated third-quarter earnings—already well below market expectations—were not materially greater than those plaintiffs claim should have been announced. Independently, the new theory must be rejected because of its patent, and prejudicial, untimeliness. While this Court, in affirming Magistrate Judge Fox's discovery orders, gave leave to plaintiffs to pursue their contention, however implausible, that the alleged understatement of third-quarter earnings might itself provide a basis for plaintiffs' claim that IBM's management knew by the start of the class period that the level of the dividend was in jeopardy, the Court at no time understood plaintiffs to be claiming that their lawsuit could stand, independent of anything to do with the dividend, on a theory that a different class of plaintiffs was defrauded by the alleged understatement of third-quarter earnings. Indeed, when defendant moved before Magistrate Judge Fox to strike portions of plaintiffs' expert's report relating to the third quarter earnings on the ground that they went well beyond the pleadings, plaintiffs represented that the alleged earnings deficiencies were offered, not as an independent basis for liability, but simply as further evidence of IBM's knowledge that it could not continue to support the dividend. *See* Tr. 3/1/96, at 7 (oral argument before Magistrate Judge Fox). These representations were accepted as true and binding, both by Magistrate Judge Fox and later by this Court, in denying defendant's motion to strike. *Id.* at 8; *In re IBM Securities*, Master File No. 92 Civ. 9076, at 2 (S.D.N.Y. Oct. 3, 1996).

clare.").[4]

In a "fraud on the market" case such as this, reasonable investors must be deemed to have knowledge of such elementary legal principles. To suppose otherwise would be to suppose that the otherwise efficient marketplace posited by the fraud on the market theory takes no account of publicly available information regarding acknowledged and binding legal principles—a suggestion wholly at odds with the assumptions on which the fraud on the market approach is premised. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 245–47, 108 S.Ct. 978, 990–92, 99 L.Ed.2d 194 (1988). The market may not be Berle but it knows black-letter corporate law.

 In this context, any statement of a company executive, or even a member of the Board, from which an investor might infer the likelihood of a particular level of dividend continuing in the future comes inherently qualified as to time and authority. No matter how couched, it is, at best, a short-term prediction by someone who lacks both actual and apparent authority to make the relevant decision. Even if wrong, such statements of opinion are not actionable. *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1256 (S.D.N.Y.1991) ("Statements about future events that are plainly expressions of opinion and not guarantees are not actionable under the federal securities law"). *See also, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies,* 75 F.3d 801, 811 (2d Cir.1996); *Friedman v. Mohasco Corp.,* 929 F.2d 77, 79 (2d Cir.1991). Here, however, the statements made by IBM's management during the class period (as well as before) were right, as the Board, within weeks or even days of each such statement, approved continuation of the dividend at the customary level. *See* Def.Exh. 68 (dividend *of $1.21 for fourth quarter of 1992 declared on October 27, 1992).*

 Turning to specifics, there are just four public statements made during the class period on which plaintiffs purport to rely in their response to defendant's summary judgment motion. *See* Pl.Mem., at 6, 8–9. *See generally, In re Seagate Technology II Sec. Litig.,* 1995 WL 66841, at *4 (N.D.Cal. Feb. 8, 1995) ("In a securities class action lawsuit, liability cannot attach· to statements made either before or after the class period.").[5] The first of these statements was made by Frank A. Metz, Jr., IBM's Senior Vice President for Corporate Finance and Planning, on September 30, 1996, *i.e.,* a day after IBM announced large new restructuring changes and layoffs. Metz, in the statement relied on by plaintiffs, tells a group of market analysts: "So I will say again what I've said before. I have no plan, no desire, and I see no need to cut the dividend." Pl.Exh. 12, at 20. Legal context quite aside, no reasonable investor could regard this statement as more than a short-term assurance, for it is immediately preceded by the statement that "Whether or not we earn the dividend this year, we'll see," *id.,* and followed by the statement that "we have to get back to an earnings level that does cover our dividend. But I see no short-term problem at all." *Id.* As Metz correctly predicted, the Board, despite poor third-quarter earnings, voted the full dividend for the fourth quarter of 1992, four weeks after this statement. *See* Def.Exh. 68 (IBM Board of Directors Minutes of Meeting 10/27/92).

 The same is true of the second statement on which plaintiffs rely, in which Metz, on October 15, 1992 (the same day that IBM announced the below-expectation earnings

---

4. To the same effect, see IBM's own Certificate of Incorporation. Def.Exh. 21, at 4.

5. It is unclear whether plaintiffs also seek to rely on a statement by IBM Director of Investor Relations James Clippard, in which, after announcing various new restructuring changes and other "bad news," Clippard, in response to a request to "address the dividend," stated that "obviously the dividend is safe." Def.Exh. 31. While made on September 29, 1992, this statement was made after the close of the market and therefore arguably might be included in the class period; but in failing to so assert, plaintiffs appear to have waived this contention. In any event, the statement, when placed in its proper context as referred to above, can only be regarded as a short-term prediction and not as a perpetual guarantee. Moreover, plaintiffs have adduced no evidence to contradict defendant's showing that Clippard's statement was made in the even more limited factual context of responding, accurately, to a false market rumor that IBM was about to reduce the fourth quarter dividend. *See* Def. 3(g) Statement, at ¶ 39; Tr. 12/5/95, at 36–39.

for the third quarter), told market analysts on a conference telephone call that: "I'll say again what I've said time and time before. We have no plans nor need to do anything about the dividend." Pl.Exh. 17, Tapes 1 & 2, at 5. As with similar previous statements, this statement, to the extent it can even be regarded as a statement of fact, was entirely true: there was no plan to reduce the dividend [6] and no economic necessity to do so.[7] Equally important, however, is the inherent short-term time frame of the statement, which Metz himself made evident by immediately adding to the above-quoted statement the words that despite "the third quarter earnings ... below our expectations in terms of cash flow.... we fully expect our cash flow ... [to be] sufficient to cover the dividends in 1992." *Id.* at 5–6. In the event, the 1992 dividends were covered just as Mr. Metz had predicted.

■ The third statement, attributed to James H. Clippard, IBM Director of Investor Relations (who, unlike Metz, was not even a member of the Board), was made as part of the same conference call with analysts on October 15. Specifically, Clippard is quoted as telling the analysts at one point: "So, we're not—despite your anxiety—concerned about being able to cover the dividend for quite a foreseeable time." *Id.* at 22. But in literally the next breath, Clippard goes on to make clear that what he means by "quite a foreseeable time" is *"this* particular quarter and *maybe* the fourth quarter and *maybe* the first part of next year." *Id.* (emphasis added). Thus, the statement could hardly be viewed by any reasonable investor as anything more than a highly qualified, very short-term prediction, bespeaking caution

about everything except the current quarter—in which, indeed, the Board declared the customary dividend.

■ The final statement on which plaintiffs rely, also made by Clippard on the same analysts conference call, can best be understood by quoting the question to which it responds: "Jim, since as you point out you can't forecast sales and you can't forecast economic environment but you still believe that even if you don't have any major changes, the economy—you'll be able to cover the dividend next year?" Pl.Exh. 17, Tapes 3 & 4, at 8. To this, Clippard responded: "Michael, I think from your planning point of view the answer to that is yes." *Id.* at 8–9. Given the numerous qualifications and cautionary statements in this exchange, no reasonable investor could possibly read Clippard's response as some kind of false statement of fact, as opposed to a much-qualified opinion.

What it comes down to is this: From January through October of 1992, the management of IBM, although beset by unprecedented economic problems of which the market was made fully aware, publicly manifested belief that the company's Board would continue to declare the company's customary dividend for the immediate future. The Board responded by doing precisely that. It even continued to fund the dividend for the fourth quarter of 1992 despite the company's anemic third quarter earnings, layoffs, and charges. In the face of the continuing decline, however, management prudently ceased making public statements about any aspect of the 1993 dividend until, on December 15, they appropriately informed the public of the fact that this

---

6. Despite years of discovery, plaintiffs have failed to unearth anything that could reasonably be called a "plan" by the IBM Board to cut dividends prior to December, 1992. The most they can point to is a nascent proposal ("Project Pacers") formulated earlier in 1992 by Robert Ripp, IBM's Treasurer, to cut IBM's dividend commitment, but not the dividend itself, by dividing IBM common stock into a new common and preferred stock, each with a separate dividend. *See* Def. 3(g) Statement ¶¶ 13–16. Quite aside from the fact that this proposal would not have reduced the total level of dividend, Project Pacers was never adopted by management or even presented

to the IBM Board, let alone put into effect. *See* Def.Exh. 139, at 83–84 (Ripp Dep.).

7. In 1992, IBM began the year with approximately $3.9 billion in cash and cash equivalents, *see* Def.Exh. 4, at 31 (1991 IBM Statement of Cash Flows), and ended the year with even greater cash balances of $4.4 billion, *see* Def.Exh. 134, at 41 (1992 IBM Statement of Cash Flows). Such cash flows were more than sufficient to cover the 1992 dividend payments, which totaled $2.76 billion for the year, *id.,* and to fund the dividend at the same level into 1993 if the Board had chosen to do so.

86

further decline had now placed in doubt continuation of the dividend at the previous level into the new year.

None of this remotely smacks of fraud. While IBM's conduct could not prevent the filing of the inevitable class actions as soon as the market reacted to its December 15, 1992 announcement, the undisputed proof of the company's conduct—now placed fully before the Court as a result of years of discovery—legally entitles the company to summary judgment.[8]

For the foregoing reasons, the Clerk is directed to enter judgment on behalf of the defendant.

SO ORDERED.

---

**8.** The judgment also includes those claims brought pursuant to § 12 of the Securities Act of 1933 and asserted by those class plaintiffs who participated in IBM's Dividend Reinvestment Plan (the "DRIP Plan"), for the simple reasons that the DRIP Plan was not an initial public offering and the DRIP Plan Manual was not a prospectus—both of which are prerequisites for liability under that section. *See Glamorgan Coal Corp. v. Ratner's Group PLC,* 1995 WL 406167, at *2–3 (S.D.N.Y. July 10, 1995). Additionally,

counsel for the sub-class of plaintiffs in the consolidated action, *Teachers Retirement Sys. of La. v. IBM Corp.,* No. 93 Civ. 6122, whose claims were brought pursuant to Section 18 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78r) and Sections 517.241 and 517.301 of the Florida Securities Act, has previously consented to dismissal of those claims, both orally (telephone conference with the Court and counsel on December 9, 1996) and in writing (letter dated December 13, 1996).