163 F.3d 102
 Fed. Sec. L. Rep. P 90,328
In re INTERNATIONAL BUSINESS MACHINES CORPORATE SECURITIES LITIGATION
Charles KOWAL, Peter R. Herold, Albert Ominsky, Douglas
Ominsky, Andrew Ominsky, Steven Horowitz, Dina Horowitz,
Joan Howard, Mark Gardy, M.E. Lifshitz, Wai Chinn, Alexander
Sands, Donald Lewis, Bruce Murphy, Barnett Stepak, and
William Steiner, Plaintiffs-Appellants,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION and Frank A.
Metz, Jr., Defendants-Appellees.
 No. 97-7266.
 United States Court of Appeals,
Second Circuit.
 Argued March 10, 1998.
Decided Nov. 17, 1998.
 
 Arlin M. Adams, Nancy Winkelman, Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania (Stuart Savett, Barbara Podell, Savett Frutkin Podell & Ryan, P.C., Philadelphia, Pennsylvania, Joseph H. Weiss, David C. Katz, Weiss & Yourman, New York City, Jules Brody, Stull, Stull & Brody, New York City on the brief), for Plaintiffs-Appellants.
 Evan R. Chesler, Richard W. Clary, Cravath, Swaine & Moore, New York City (Melvyn I. Weiss, Robert A. Wallner, Milberg Weiss Bershad, Hynes & Lerach, LLP, New York City on the brief), for Defendants-Appellees.
 Before: OAKES, WALKER, MAGILL,* Circuit Judges.
 BACKGROUND
 JOHN M. WALKER, Circuit Judge:
 
 
 1
 Plaintiffs, a class of purchasers of International Business Machines Corporation ("IBM") securities between September 30, 1992 and December 14, 1992 (the "class period"), appeal from an order of the United States District Court for the Southern District of New York (Jed S. Rakoff, District Judge ), granting defendants' motion for summary judgment and dismissing plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 12(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77l(2).
 
 
 2
 The following facts are undisputed. In 1991, IBM suffered major losses resulting in a $4.2 billion decline in revenue, a 5.6 percent decline in gross profits, and a reduction in net earnings resulting in a loss of $4.95 a share. During 1992, IBM's financial situation continued to deteriorate and the company announced worldwide capacity reductions and restructuring actions. In March of 1992, Moody's Investors Service lowered its rating on IBM's long-term debt. Despite these difficulties, IBM's management stated that the company had no plans to reduce the dividend and that it would continue to fund the dividend at a rate of $1.21 per share. This dividend rate was important to investors, many of whom purchased IBM securities because of its strong dividend.
 
 
 3
 On September 29, 1992, IBM announced a $3.3 billion pre-tax restructuring program. On the same day, IBM's Senior Vice President and Chief Financial Officer, Frank A. Metz, Jr., told reporters "obviously the dividend is safe." The following day, Metz reported to analysts on a conference call:
 
 
 4
 So I will say again what I've said before. I have no plan, no desire, and I see no need to cut the dividend. If you want to say to me--well, what if you run ten years without covering the dividend, will you have a problem? I expect I will ... I mean, unless they change the accounting rules a lot. So we have to get back to an earnings level that does cover our dividend. But I see no short term problems at all.
 
 
 5
 On October 15, 1992, IBM announced poor financial results for the third quarter and reported that it would eliminate 25,000 more jobs in 1993. IBM officials announced that third quarter operating net earnings were $86 million, or $0.15 per share. In a conference call on the same day, Metz told analysts:
 
 
 6
 We have no plans nor need to do anything about the dividend. Our results in the third quarter although below our expectations in terms of cash flow are not a major hit to us. And we fully expect our cash flow ... to be much higher than they were last year. And sufficient to cover the dividend in 1992.
 
 
 7
 During this same conference call, Jim Clippard, IBM's Director of Investor Relations, stated, "we're not--despite your anxiety--concerned about being able to cover the dividend for quite a foreseeable time." Later in the call, in response to an analyst's statement that:
 
 
 8
 since as you point out you can't forecast sales and you can't forecast economic environment but you still believe that even if you don't have any major changes, the economy--you'll be able to cover the dividend next year?
 
 
 9
 Clippard stated "I think from your planning point of view the answer to that is yes."
 
 
 10
 After October 15, 1992, IBM made no public statements with regard to the dividend. However, numerous analysts and press reports commented on IBM's financial situation and opined that IBM's dividend was likely to be cut. Despite IBM's poor financial situation, on October 27, 1992, IBM again declared a quarterly dividend of $1.21 per share.
 
 
 11
 On December 15, 1992, IBM announced that it was "unsure of its ability to maintain the dividend at current levels." In response to this announcement, the price of IBM's stock decreased 6 3/4 points, from 62 7/8 to 56 1/8. The next day, December 16, the first of the class actions consolidated into this current litigation was filed in the district court. On February 26, 1993, plaintiffs filed a consolidated and amended class action complaint, alleging that during the class period, September 30, 1992, through December 14, 1992, IBM disseminated false and misleading information to investors. On January 26, 1993, more than one month after the end of the class period, IBM's board of directors voted to cut the dividend from $1.21 per share to $.54 per share. In July of 1993, IBM cut its dividend again to $.25 per share.
 
 
 12
 Plaintiffs sought discovery and defendants complied with plaintiffs' initial request. Plaintiffs moved to expand discovery to include documents relating to the July 1993 dividend cut. IBM refused to produce these documents on the ground that the request extended well beyond the class period, which ended on December 14, 1992. The district court ordered IBM to produce certain limited documents relating to the July 1993 dividend cut and directed plaintiffs to advise the court if the documents established a relationship between the July dividend cut and the alleged misrepresentations during the class period. After reviewing the documents, plaintiffs moved to compel full production. The district court denied plaintiffs' request to expand discovery to include the July 1993 dividend cut on the ground that the burden and expense of discovery outweighed the need for the documents. See In re International Bus. Machs. Corp. Secs. Litig., No. 92-9076, slip op. at 5 (S.D.N.Y. Dec. 8, 1993).
 
 
 13
 Plaintiffs also moved to compel a non-party, Morgan Stanley & Co., to produce documents relating to IBM's cash flow and dividend policy concerning matters prior to June 30, 1993. When Morgan Stanley refused to produce documents relating to the July 1993 dividend cut, plaintiffs once again moved to compel this discovery. The district court denied plaintiffs' motion on the same ground that it had denied plaintiffs' request to expand discovery as to IBM. See In re International Bus. Machs. Corp. Secs. Litig., No. 92-9076, (S.D.N.Y. July 8, 1994).
 
 
 14
 Subsequently, the defendants moved for summary judgment, pursuant to Fed.R.Civ.P. 56. The district court granted defendants' motion and dismissed plaintiffs' claims. See In re International Bus. Machs. Corp. Secs. Litig., 954 F.Supp. 81 (S.D.N.Y.1997) ("In re IBM "). This appeal followed.
 
 DISCUSSION
 
 15
 We review a district court's decision to grant summary judgment de novo. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). Summary judgment is properly granted when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). In assessing the record, "the non-movant will have his allegations taken as true," Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir.1996) (per curiam) (quotation marks omitted), and the district court must draw all factual inferences in favor of the non-moving party.
 
 I. Section 10(b) and Rule 10b-5 Claims
 
 16
 Plaintiffs allege that IBM violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that IBM made various untrue statements when it announced that its dividend was secure and that it had no plans to cut it. To state a cause of action under Section 10(b) or Rule 10b-5 plaintiffs must prove that IBM (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. See In re Time Warner Inc. Secs. Litig., 9 F.3d 259, 264 (2d Cir.1993); Burke v. Jacoby, 981 F.2d 1372, 1378 (2d Cir.1992).
 
 
 17
 The decisive issue in this case is the first element, which requires plaintiffs to prove that IBM made a false statement or omission of material fact. A statement is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).
 
 
 18
 The statements challenged by plaintiffs are expressions of optimism or projections about the future. Each statement plaintiffs challenge in this action concerns an uncertain future event--the payment of dividends. Statements that are opinions or predictions are not per se inactionable under the securities laws. See Time Warner, 9 F.3d at 266; In re Apple Computer Secs. Litig., 886 F.2d 1109, 1113 (9th Cir.1989). Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, see Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir.1993), or if the speaker does not genuinely or reasonably believe them, see Time Warner, 9 F.3d at 266; In re Donald Trump Casino Secs. Litig., 7 F.3d 357, 368 (3d Cir.1993). None of these conditions applies in this case.
 
 
 19
 First, the challenged statements regarding the future payment of dividends were predictions or opinions, and not guarantees. This conclusion is compelled by both the facts and the law. Under New York law, corporations cannot guarantee the payment of dividends because the directors of a corporation owe a duty to shareholders to declare dividends only when it is in the best interests of the corporation to do so. See Lindgrove v. Schluter & Co., Inc., 256 N.Y. 439, 444, 176 N.E. 832 (1931) (contract requiring declaration of dividends is not legal). Moreover, the power to declare dividends is traditionally vested in a corporation's board of directors. See Burton v. Exxon Corp., 583 F.Supp. 405, 415 (S.D.N.Y.1984); Swinton v. W.J. Bush & Co., 199 Misc. 321, 102 N.Y.S.2d 994, 996 (N.Y.Sup.Ct.1951). Indeed, in the case of IBM, the corporation's publicly-filed Certificate of Incorporation confers the power to declare dividends exclusively on IBM's board. Thus, as noted by the district court, see In re IBM, 954 F.Supp. at 84, IBM's management lacked the actual or apparent authority to guarantee the dividend, and it would be unreasonable for the market to have interpreted the statements at issue as anything other than an individual's prediction about the future. Accordingly, we conclude that the challenged statements are, as a matter of law, opinions and not guarantees.
 
 
 20
 Plaintiffs' claim also fails because plaintiffs can point to no material misrepresentations in any of the statements at issue. The challenged statements were neither false nor misleading. After each of the challenged statements were made, IBM maintained its dividend at its prior level. The first challenged statement was made when, in response to a question about the dividend, Clippard replied that "obviously the dividend is safe." Clippard made this statement on September 29, 1992, before the start of the class period, which began on September 30, 1992. A defendant, however, is liable only for those statements made during the class period. See In re Clearly Canadian Secs. Litig., 875 F.Supp. 1410, 1420 (N.D.Cal.1995). Plaintiffs could have sought to include this statement in the class period but they did not. Therefore, we need not consider it on appeal.
 
 
 21
 Plaintiffs next challenge two statements made by IBM management relating to whether there was a plan or need to cut the dividend. In the first statement, on September 30, 1992, Metz told securities analysts, "I will say again what I've said before. I have no real plan, no desire, and I see no need to cut the dividend." In the second challenged statement, on October 15, 1992, Metz announced that "I'll say again what I've said time and time before. We have no plans nor need to do anything about the dividend." Plaintiffs argue that these statements contain affirmative misrepresentations because IBM did have a plan and a need to cut its dividend. We disagree and conclude that at the time these statements were made they were neither false nor misleading.
 
 
 22
 Plaintiffs assert that IBM's representation that it had no plan to cut the dividend was false because IBM had formulated a plan to cut its dividend--Project Pacers. However, the evidence shows that Project Pacers was a proposal formulated by IBM's Treasurer Robert Ripp in 1992 to enhance shareholder value and achieve flexibility with the dividend commitment by dividing the common stock into a combination of preferred and common stock that still would yield a total dividend of $1.21.
 
 
 23
 Plaintiffs mischaracterize this study of dividend alternatives as a plan adopted by IBM's management to cut the dividend. Moreover, the evidence in the record demonstrates that the proposal was never presented or recommended to the Board, much less adopted by it. In fact, Ripp testified that "[w]e made no recommendation to do this proposal to the board." Even if we were to accept plaintiffs' claim that this plan was adopted by management, IBM's statements that it had no plan to cut the dividend would not be false because the plan would not have reduced the total level of the dividend. Although shareholders would have received a payout of less than $1.21 for each share of common stock, the dividend payout on their shares of common and preferred stock combined would still have been $1.21.
 
 
 24
 Plaintiffs also argue that IBM falsely represented that it had no need to cut the dividend. As noted by the district court, however, it was not economically necessary for IBM to reduce the dividend because IBM maintained sufficient cash balances to pay the $1.21 dividend in full. As a result, at the time these statements were made they were truthful. This conclusion is confirmed by hindsight: IBM, as Metz predicted, had maintained its dividend of $1.21 per share throughout 1992.
 
 
 25
 In addition, the statements reflected only the speaker's opinion on the fate of the dividend in the near term. Metz's September 30, 1992 statement was preceded by the statement that "[w]hether or not we earn the dividend this year, we'll see" and was followed by the statement that "we have to get back to an earnings level that does cover our dividend. But I see no short-term problem at all." Similarly, Metz's October 15, 1992 statement was followed by the statement that "we fully expect our cash flow [to be] sufficient to cover the dividends in 1992." It would be unreasonable, as a matter of law, for an investor to rely on these projections as long-term guarantees because these statements contain sufficient cautionary language to indicate that they were only short-term predictions. As we have held, "[l]iability may not be imposed based on statements that, considered in their entirety, clearly 'bespeak caution.' " San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 811 (2d Cir.1996) (quoting Goldman v. Belden, 754 F.2d 1059, 1068 (2d Cir.1985)).
 
 
 26
 The fourth statement plaintiffs rely on was made in the same conference call to analysts on October 15, 1992, by Clippard. During the call, Clippard stated that "we're not--despite your anxiety--concerned about being able to cover the dividend for quite a foreseeable time." Plaintiffs argue that this statement is actionable because it is "[h]ardly a short term statement." We disagree with plaintiffs because immediately after this statement, Clippard clarified his assertion with the qualification that "[a]nd our view of this particular quarter and maybe the fourth quarter and maybe the first part of next year is that this is a relatively short-term period of economic difficulty we're going through. And we think that we can ride right through this with no problem [whatsoever] as far as [the] dividend is concerned."
 
 
 27
 This statement is only an expression that at the time the statement was made the company was not "concerned" about covering the dividend for this quarter; it contains no long-term guarantee or assurance that the dividend will be paid at a specific level for a foreseeable time. Moreover, it is plainly an expression of optimism that is too indefinite to be actionable under the securities laws. See San Leandro, 75 F.3d at 811 (company's statements that it was "optimistic" about future earnings and "expected" its product to do well "cannot have misled a reasonable investor ... and cannot constitute actionable statements under the federal securities laws"); Genna v. Potts, 1995 WL 222043, at * 4 (D.Md. April 13, 1995) (statement that "we continue to feel that the current monthly dividend level of $0.26 per share will be sustained through 1994" and "we're still optimistic that we can maintain the 26 cents dividend in 1995" are non-actionable "expressions of optimism").
 
 
 28
 The final statement, also attributed to Clippard in the October 15, 1992 conference call, came in a response to an analyst's question that:
 
 
 29
 since as you point out you can't forecast sales and you can't forecast economic environment but you still believe that even if you don't have any major changes, the economy--you'll be able to cover the dividend next year?
 
 
 30
 Clippard stated "I think from your planning point of view the answer to that is yes. I think that despite the economic turmoil we see that we would plan on some modest revenue growth in the year."
 
 
 31
 This highly qualified expression of corporate optimism is not sufficiently material, as a matter of law, to support a claim for securities fraud. This discussion is phrased as a loose prediction and in no way promises to maintain the dividend at any stated level. The discussion between Clippard and the analyst contains no assurances about the dividend. Moreover, no reasonable investor would rely on this discussion given the cautious language and qualifying terminology. See Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 218 (4th Cir.1994) ("It is well recognized that statements that include ... cautionary language are usually 'not the stuff of which securities claims are made.' " (citation omitted)).
 
 
 32
 As noted above, an opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact. See Time Warner, 9 F.3d at 266; Donald Trump Casino, 7 F.3d at 368; Apple, 886 F.2d at 1113. Plaintiffs claim that Metz and Clippard either knew or should have known that their statements were false or misleading. However, there is no evidence in the record to support a finding that these statements were made in bad faith or that the speakers did not genuinely and reasonably believe that they were accurate.
 
 
 33
 First, there is no evidence in the record indicating that Clippard and Metz did not genuinely believe that in the immediate future the board of directors would be able to maintain its dividend. Indeed, as noted above, such a belief was reasonable given IBM's cash balances and its ability to continue the $1.21 dividend in the short term. Finally, there is nothing in the record to suggest that the speakers were aware of any facts undermining the accuracy of these statements, and, as we discussed above, there is no evidence that IBM had a plan or need to cut the dividend. For these reasons, we conclude that plaintiff has failed to identify any misstatements or omissions of material fact which would support a Section 10(b) or Rule 10b-5 claim.
 
 II. Duty To Correct And Duty To Update
 
 34
 Plaintiffs argue that even if IBM's statements were true when made, the company had a duty to correct the dividend statements at issue because its position on the dividend materially changed on November 25, 1992, when Metz revealed to representatives of the Michigan Pension Fund that IBM's dividend was, as appellants put it, "vulnerable and likely to be cut." Defendants argue that Metz never stated that the dividend was likely to be cut and that he only said that he was personally less confident about the dividend. Because we are reviewing the district court's grant of summary judgment, we will assume that plaintiffs' allegations are true and presume that Metz made the challenged assertion.
 
 
 35
 Although plaintiffs phrase their claim as a duty to correct, we believe plaintiffs are alleging a violation of a duty to update. The duty to correct applies when "a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not." Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir.1995). Thus, if and when a speaker learns that a prior statement was misleading when made, a duty to correct arises. Here, however, IBM's statements were not misleading when made and therefore we reject any claim by plaintiffs that IBM was under a duty to correct them.
 
 
 36
 A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event. See Time Warner, 9 F.3d at 267; In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1431 (3d Cir.1997). However, there is no duty to update vague statements of optimism or expressions of opinion. See San Leandro, 75 F.3d at 811. There is also no need to update when the original statement was not forward looking and does not contain some factual representation that remains "alive" in the minds of investors as a continuing representation, see Burlington Coat Factory, 114 F.3d at 1432, or if the original statements are not material, see Hillson, 42 F.3d at 219.
 
 
 37
 The statements at issue here were not material and "lack the sort of definite positive projections that might require later correction." Time Warner, 9 F.3d at 267; see also San Leandro, 75 F.3d at 811 (finding no duty to update "subdued general comments" of optimism). The challenged statements are vague expressions of opinion which are not sufficiently concrete, specific or material to impose a duty to update.
 
 
 38
 Further, these statements were true expressions of IBM's view at the time. On September 30, and October 15, 1992, IBM did not have a plan or need to alter the dividend. There was no representation of forward intent or any intimation that IBM would maintain its dividend indefinitely. Each statement was accompanied by qualifying language indicating that the speaker was only referring to the short term. As we discussed above, the September 30 statement explained that there was "no short term problem" and two of the October 15 statements indicated only that the company expected to cover its dividend in 1992 and "maybe" the first part of 1993. In light of the fact that IBM was fully able to cover its dividend at the stated level in the short term, the challenged statements remained precisely correct even though IBM subsequently cut its dividend in July 1993.
 
 III. Third Quarter Earnings
 
 39
 Plaintiffs also argue that the district court "erred in failing to consider or to rule on plaintiffs' allegations that IBM made false and misleading statements and omissions as to its third quarter earnings." We easily reject this argument. The district court not only considered plaintiffs' allegations as to the third quarter earnings, but found them waived as untimely and, in any event, without merit. The district court concluded that IBM's statements regarding third quarter earnings were "not materially greater than those plaintiffs claim should have been announced." In re IBM, 954 F.Supp. at 84 n. 3.
 
 
 40
 We need not reach the merits of plaintiffs' claim because we agree with the district court that plaintiffs have waived this claim. During discovery plaintiffs' expert calculated separate damages based on the alleged understatement of 1992 third quarter earnings. Subsequently, IBM moved to strike this portion of the expert's report on the ground that it related to a new claim stemming from IBM's failure to announce its third quarter earnings, a separate claim of liability that was never raised in the complaint. Plaintiffs responded by arguing that the expert's opinion did not relate to a new claim and instead supported their dividend claim. The district court gave leave to plaintiffs to amend their complaint to assert allegations of liability premised on IBM's alleged overstatement of third quarter earnings. See id. Plaintiffs never pled this new theory of liability and therefore have waived any claims relating to it.
 
 IV. Section 12(2)
 
 41
 Those plaintiffs who participated in IBM's Dividend Reinvestment Plan (the "DRIP Plan") also appeal the district court's grant of summary judgment on their claims brought pursuant to Section 12(2) of the Securities Act on the ground that IBM made false statements and omissions of material fact in IBM's DRIP Plan Manual and the documents that were incorporated therein by reference. Specifically, plaintiffs claim that in its 1991 Annual Report, which was incorporated by reference into its DRIP Manual, IBM Chairman John F. Akers stated in response to a question by a stockholder that "We have no plans, nor do we see any need, to cut the dividend."
 
 
 42
 Section 12(2) imposes liability on any person who offers or sells a security by means of a prospectus or oral communication containing a materially misleading statement or omission. See 15 U.S.C. § 77l(2). IBM argues that there is no liability because only those purchasers who acquired their securities in a public offering by an issuer or its controlling shareholders by means of a prospectus or oral communication relating to a prospectus may invoke Section 12(2), and the DRIP Plan was not a public offering or prospectus. See Gustafson v. Alloyd Co., 513 U.S. 561, 580-82, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); Glamorgan Coal Corp. v. Ratner's Group PLC, 1995 WL 406167, at * 3 (S.D.N.Y. July 10, 1995). We need not reach this argument, however, because we have already held that IBM's statement that "we have no plans, nor do we see any need, to cut the dividend" is not a materially false or misleading statement.
 
 V. Discovery
 
 43
 Finally, we reject plaintiffs' claim that the district court abused its discretion in limiting discovery to information that related to matters that occurred prior to IBM's January 26, 1993 dividend cut. The record reflects that the district court carefully considered the interests of both parties in deciding whether to expand discovery and concluded that plaintiffs' "weak showing" of potential relevance in its extensive discovery request was insufficient to outweigh the burden and expense of redeposing witnesses, producing documents, and delaying trial. As the Supreme Court has noted, the "trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Given that the information sought was only minimally relevant to plaintiffs' allegations that IBM made false statements during the class period and the definite burden that compliance with such requests would place on IBM, we find that the district court's decision was a proper exercise of its discretion.
 
 CONCLUSION
 
 44
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Frank J. Magill, of the United States Court of Appeals for the Eighth Circuit, sitting by designation