GABRIEL CAPITAL, L.P., a Delaware Limited Partnership, and Ariel Fund Ltd., a Cayman Islands Corporation, Plaintiffs,

v.

NATWEST FINANCE, INC., f/k/a Gleacher Natwest Inc.; Natwest Capital Markets Limited; National Westminster Bank Plc; McDonald Investments Inc., f/k/a McDonald & Company Securities, Inc.; and Steel Dynamics Inc., Defendants.

NatWest Finance, Inc., Third–Party Plaintiff,

v.

John W. Schultes, and Gabriel Capital Corporation, and Selin Cebeci, and Jack Mayer, and Ezra Merkin, and John Does 1–50, Third–Party Defendants.

No. 99 CIV. 10488(SAS).

United States District Court, S.D. New York.

Oct. 13, 2000.

James R. Safley, Thomas B. Hatch, Corey L. Gordon, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, David G. Glasser, Levin & Glasser, P.C., New York City, for Plaintiffs Gabriel Capital and Ariel Fund.

Walter P. Loughlin, Latham & Watkins, New York City, David Siegel, David I. Gindler, Daniel P. Lefler, Irell & Manella LLP, Los Angeles, CA, Robert S. Walters, Cathleen M. Shrader, Barrett & McNagny, Fort Wayne, IN, for Defendant SDI.

Frank C. Razzano, Adam Proujansky, Benjamin R. Ogletree, Dickstein Shapiro Morin & Oshinsky LLP, New York City, for Defendants NatWest Capital Markets Limited and National Westminster Bank PLC.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Gabriel Capital, L.P. ("Gabriel Capital") and Ariel Fund Ltd. ("Ariel Fund") (collectively "plaintiffs") are suing defendants

NatWest Finance, Inc. ("NatWest Finance"), NatWest Capital Markets Limited ("NatWest Capital"), National Westminster Bank PLC ("NatWest Bank"), McDonald Investments Inc. ("McDonald"), and Steel Dynamics Inc. ("SDI") for securities fraud arising from plaintiffs' purchase of certain debt securities (the "Note" or "Notes"). Plaintiffs allege that defendants violated section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by making or participating in the making of untrue statements and by omitting material facts in order to induce plaintiffs to purchase the Notes. In addition, plaintiffs allege that NatWest Bank is a controlling person within the meaning of section 20 of the 1934 Act, 15 U.S.C. § 78t(a), with respect to the activities of NatWest Finance and NatWest Capital. Finally, plaintiffs allege that, through the same conduct, defendants committed common law fraud, conspired to commit fraud, and aided and abetted fraud, all in violation of New York law.

On May 8, 2000, this Court denied a motion to dismiss filed by NatWest Finance and McDonald and granted in part and denied in part a motion to dismiss filed by SDI. *See Gabriel Capital, L.P. v. NatWest Finance, Inc.*, 94 F.Supp.2d 491 (S.D.N.Y.2000) (the "Opinion"). On May 30, 2000, plaintiffs filed their second amended complaint (the "SAC"). In the SAC, plaintiffs attempted to cure the deficiencies in their allegations against SDI and added claims against two new defendants—NatWest Capital and NatWest Bank. SDI, NatWest Capital and NatWest Bank all have moved to dismiss the SAC pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6).

This case illustrates the tension between the heightened pleading requirements in securities fraud cases and the realistic limitations on the ability of plaintiffs to make specific factual allegations prior to the opportunity to obtain full discovery. Plaintiffs have filed a 61–page complaint containing a wealth of detailed allegations. While the length of a complaint alone is no guarantee of its adequacy, this complaint provides sufficient detail to state the claims it purports to plead. Common sense requires that courts remember the purpose of a pleading—to state a claim and provide adequate notice of that claim. A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage. To require further pleading by these plaintiffs would be a misguided exercise.

As the sheer weight of this Opinion makes clear, I have studied plaintiffs' allegations and defendants' arguments in great detail. Plaintiffs have plead facts sufficient to establish each and every element of their claims and placed defendants on reasonable notice of those claims. This case now warrants full discovery.

## I. BACKGROUND

### A. Facts

Because the Opinion exhaustively summarized the allegations in the Amended Complaint, *see* Opinion, 94 F.Supp.2d at 495–98, I will discuss only those portions of the SAC relevant to the pending motions. All facts alleged in the SAC are assumed to be true. *See Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999) ("On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff.").

### 1. General background

Nakornthai Strip Mill Public Company Limited ("NSM") owns a steel mill near Chonburi, Thailand. *See* SAC ¶ 9. In 1995, John W. Schultes, then an employee of U.S. Steel, persuaded Sawasdi Horrungruang, the Chairman of the Board of Directors of NSM, to construct a mini-mill (the "Mini–Mill") at the same site. *See id.* The design of the Mini–Mill was experimental, incorporating new and unproven

technology. *See id.* NSM initially obtained financing for the Mini–Mill from Horrungruang and a group of Thai banks. *See id.* ¶ 10. When those sources of financing dried up, due in part to an economic downturn in Thailand in 1997, Schultes approached defendant McDonald, an investment bank with particular expertise in the steel industry. *See id.* McDonald agreed to help NSM raise funds in the United States. *See id.* The SAC states that "McDonald, in turn, approached defendant NatWest to become the lead underwriter on the NSM expansion project financing." *Id.* ¶ 11.

### 2. The various NatWest defendants

The SAC uses "NatWest" to refer collectively to NatWest Finance, NatWest Capital, and NatWest Bank. *See id.* ¶ 6(f). NatWest Bank, an English corporation with its principal place of business in London, is engaged in a variety of banking, financial and related activities in numerous countries, including the United States. *See id.* ¶ 6(a). NatWest Bank, acting directly and through its agents and subsidiaries, served as lead underwriter of the Note offering. *See id.*

NatWest Capital, an English corporation with its principal place of business in London, is a subsidiary of NatWest Bank. *See id.* ¶ 6(b). The SAC alleges, on information and belief, that NatWest Capital "has no on-going or regular business operations, but is a corporate form used by NatWest Bank from time to time to engage in high yield financing transactions and other capital market activities." *Id.* NatWest Bank "used [NatWest Capital] to pose as an 'initial purchaser' of the Notes and provided (or was prepared to provide) the funds to [NatWest Capital] for this purpose." *Id.*

NatWest Finance, a Delaware corporation with its principal place of business (prior to April 1999) in New York, is a wholly-owned subsidiary of NatWest Group Holdings Corporation ("NatWest Group Holdings"). *See id.* ¶ 6(c).[1] NatWest Group Holdings, in turn, is a wholly-owned subsidiary of NatWest Bank. *See id.* NatWest Bank and its subsidiaries are organized into six main business sectors, one of which is NatWest Markets. *See id.* ¶ 6(d). NatWest Finance is one of the businesses in NatWest Markets, which NatWest Bank describes as its corporate and investment banking arm. *See id.* In connection with the Note offering, NatWest Bank "used [NatWest Finance] to assist it in performing an investigation of the creditworthiness of NSM, and to market and sell the Notes to the plaintiffs and other investors." *Id.*

According to plaintiffs, NatWest Finance is a mere conduit for—and functions solely to achieve the purposes of—NatWest Bank. *See id.* ¶ 6(e). NatWest Finance did not have the authority on its own to act as the underwriter of the Notes, nor did it have sufficient capital to purchase the Notes. *See id.* NatWest Finance ultimately received approval to act as an underwriter from the Director of NatWest Bank's Group Risk Department and the Chief Operating Officer of NatWest Bank, who also has the title of Chief Executive of Group Operations. *See id.* In giving its approval, NatWest Bank "limited the aftermarket trading permitted in the Notes and required that the bonus pool for the personnel involved in the transaction be reduced by any losses incurred in the Note transaction." *Id.*

The SAC alleges that, in connection with the marketing, sale and underwriting of the Notes, NatWest Finance, NatWest Capital and NatWest Bank "operated as a single integrated enterprise and their business operations were so intermingled as to substantially disregard the corporate separation between these entities." *Id.* ¶ 6(f).

---

**1.** During the relevant time period, NatWest Finance was known as Gleacher NatWest, Inc. *See id.* ¶ 6(c).

The materials presented by NatWest when it initially offered its services to NSM referred interchangeably to "NatWest High Yield Group," "NatWest Markets," "Gleacher NatWest," and "NatWest Group," which was described as " 'one of the largest and best capitalized [sic] financial institutions in the world.' " *See id.*[2] In addition, an August 5, 1997 engagement letter to NSM was sent on behalf of "Gleacher NatWest Inc. and its affiliates." *Id.* Three weeks later, NatWest Capital sent a letter to NSM indicating that it was "highly confident of [its] ability to sell or place $350 million" of the Notes. *Id.* Finally, David Wheeler, one of the principal actors in the relevant transactions, represented to plaintiffs that he was an agent of NatWest Finance but was identified on his business card as the Senior Vice President of Investment Banking for NatWest Bank. *See id.* Similarly Max Holmes, who identified himself as a Managing Director of NatWest Finance, signed an acknowledgment at the closing on behalf of NatWest Capital. *See id.*

### 3. Alleged misrepresentations concerning SDI's role

NatWest and McDonald worked together to market the Notes to institutional investors, including plaintiffs. *See id.* ¶ 11. As part of this marketing effort, NatWest and McDonald prepared an Offering Memorandum and slides that were shown during "road shows." *See id.* In mid-to-late February 1998, Robert Sherman, an agent and employee of NatWest, contacted Thomas Mullen, an agent and employee of plaintiffs, seeking an opportunity to pitch the Notes. *See id.* ¶ 13. Mullen referred Sherman to Jack Mayer and Selin Cebeci, representatives of plaintiffs, who agreed to meet with Sherman and other representa-

tives of NatWest, McDonald, and NSM. *See id.*

### a. The road shows

On or about February 23, 1998, Mayer and Cebeci met with Schultes (representing NSM), Sherman, Wheeler and Ponte Singh (representing NatWest), and Gary Heasley (representing McDonald). *See id.* ¶ 14. At this meeting (the "February 23 Road Show"), defendants displayed a series of slides used at other road shows, describing, discussing, and elaborating on the information contained therein. *See id.* ¶ 16. The Opinion details the allegedly fraudulent statements concerning the Mini–Mill made by defendants at the February 23 Road Show. *See* Opinion, 94 F.Supp.2d at 496–97.

Defendants also discussed the role of SDI at the Mini–Mill during the February 23 Road Show. *See* SAC ¶ 17. They described the pre-eminent position of SDI in the mini-mill industry and the key role played by Keith Busse, the CEO of SDI, in starting up and managing that company. *See id.* In addition, plaintiffs were given a copy of a magazine article entitled "Hot Metal Man," which described Busse as the person who had developed the mini-mill concept and made it successful. *See id.* Wheeler, Schultes and Heasley told plaintiffs that Busse had participated in other road shows and was available by telephone if plaintiffs wanted to speak directly with him. *See id.* Finally, Wheeler, Schultes and Heasley reiterated to plaintiffs a number of statements made by Busse at other road shows,[3] attributing those statements to Busse and/or SDI. *See id.* The SAC provides specific examples of these statements. *See id.*

---

**2.** According to plaintiffs, the mention of "NatWest Group" is "a clear reference to NatWest Bank." *Id.*

**3.** The SAC lists nine other road shows, none of which plaintiffs attended, at which Busse

and representatives of other defendants allegedly made a number of misrepresentations concerning the Mini–Mill. *See* SAC ¶¶ 12(a)-(h).

### b. SDI's actual role

The SAC alleges that, through its comments at other road shows and its representations communicated to plaintiffs at the February 23 Road Show, SDI misled investors as to its actual role in the Mini–Mill and its assessment of the Mini–Mill's capability. *See id.* ¶ 12(k). In November 1997, SDI made clear to NatWest and McDonald that it could assume only a limited role in helping NSM's management. *See id.* ¶ 12(o). At a meeting of SDI's board of directors on November 12, 1997, Stickler, Heasley, Wheeler, Holmes, and Schultes all acknowledged that SDI: (1) would not have a significant manpower commitment; (2) would not have a permanent or semi-permanent presence in Thailand; and (3) would have a limited, technical and advisory relationship with NSM. *See id.* ¶ 12(p). On November 18, 1997, counsel for McDonald forwarded to counsel for SDI a draft management agreement entitled the "Management and Technical Assistance Agreement." *See id.* ¶ 12(q). Counsel for SDI responded that the word "management" in the title was an overstatement of SDI's role and sought to have the title changed to "Advisory Services Agreement." *See id.* ¶¶ 12(r)-(s). In January 1998, counsel for McDonald told counsel for SDI that it was too late to change the name of the agreement because of the many references to the "Management and Technical Assistance Agreement" in the Offering Memorandum. *See id.* ¶ 12(t). The preliminary Offering Memorandum was produced in February and the final Offering Memorandum was produced in March, with the name of the agreement changed to "Management Advisory and Technical Assistance Agreement." *See id.* ¶¶ 12(u)-(v).

The terms of the Management Advisory and Technical Assistance Agreement (the "SDI Agreement"), which were being negotiated as the road shows took place, contradict the representations being made by Busse. *See id.* ¶ 12(w). In particular,

the SDI Agreement contains the following provisions:

> Nothing in the agreement shall be deemed to constitute either party as a "joint venturer or partner of the other Party."

> SDI did not intend "to maintain any regular staff presence or any other permanent or semi-permanent presence or establishment at NSM's plant in Thailand . . . ."

> The agreement stated that "SDI does not know whether, and has made no representations to NSM, express or implied, to the effect that SDI Technology or SDI's techniques and culture are appropriate for or best suited to NSM's needs."

> The agreement stated that no one would make any misleading statement "regarding the relationship between SDI and NSM, or state, suggest or imply that SDI manages NSM, exerts management influence or control over NSM, [or] supervises the operations of NSM . . ."

> The agreement provided that "SDI has undertaken no independent study or analysis of NSM's proposed operations, or of its Mill, its proposed Products, its technology and equipment, its management structure, the nature of its workforce, its labor relations, the sources and nature of its raw materials, its markets, its transportation system, or the impact of its Thai culture, legal system, or tax laws upon its proposed business or upon Mill operations."

*Id.*

The SAC alleges that NatWest, McDonald and SDI misrepresented SDI's role in the Mini–Mill because they knew that they would not be able to obtain additional financing if NSM's management was in control of the project. *See id.* ¶¶ 12(i)-(j). "Busse was aware that SDI's involvement was critical to the success of the offering and knew or should have known that his comments on SDI's role in the management of NSM and its review of the Mill would be repeated by the other defen-

dants at the road shows Busse did not attend." *Id.* ¶ 12(j). Similarly, Busse acquiesced after his suggested changes to the title of the SDI Agreement were rejected, even though he knew that the other defendants wanted to keep the original title in order to mislead potential investors. *See id.* ¶ 12(r).

### c. The Offering Memorandum

NatWest and McDonald prepared an Offering Memorandum for prospective investors. *See id.* ¶ 11. The Offering Memorandum contained a description of SDI's role at the Mini–Mill and a summary of the SDI Agreement. *See id.* ¶ 12(x). The SAC alleges that "SDI participated in drafting and editing these portions of the Offering Memorandum, and permitted them to convey a misleading impression of SDI's role." *Id.* Counsel for SDI reviewed drafts of the Offering Memorandum and submitted extensive handwritten notations and editorial comments. *See id.* Some of SDI's comments were incorporated into the Offering Memorandum and others were not. *See id.* SDI also was given the opportunity to review the Offering Memorandum before it became final. *See id.* ¶ 12(y). "Through this process, SDI caused the Offering Memorandum to mislead the plaintiffs about the actual level of involvement that SDI intended to have with NSM." *Id.*

### d. The slides

NatWest and McDonald also prepared a series of slides that were shown to prospective investors during the road shows. *See id.* ¶ 11. The SAC alleges that these slides contained the following misrepresentations made by SDI:

"NSM will be the most advanced, and one of the lowest costs flat-rolled steel production companies in the world;"

4. Plaintiffs contend that they only discovered this information during the July 13, 2000 deposition of Busse and that Busse's responses

"As a managing owner, [SDI] will have the second largest equity stake in NSM with a 10% ownership position;"

"SDI will provide managerial and technical support under a 10–year Management Agreement;" and

"Concept and operating assumptions verified by [SDI]."

*Id.* ¶ 12(j). In their brief in opposition to SDI's motion to dismiss, plaintiffs allege for the first time that Busse reviewed the slides. *See* Plaintiffs' Memorandum of Law in Opposition to Defendant Steel Dynamics, Inc.'s Motion to Dismiss the Second Amended Complaint ("Pl. SDI Opp. Mem.") at 2–3.[4]

### 4. Sale of the Notes and its aftermath

After reviewing and relying upon the written materials provided to them, as well as the oral representations made by defendants, "plaintiffs together purchased $15.5 million in principal value of 12% NSM Senior Steel Mortgage Notes due 2006." SAC ¶ 18. This purchase took place on or about March 2, 1998. *See id.*

On August 24, 1998, SDI's counsel, Robert S. Walters, sent a memorandum to NSM regarding serious problems with the Mini–Mill (the "Walters Memo"). *See id.* ¶ 19. The Opinion discusses in detail the contents of the Walters Memo. *See* Opinion, 94 F.Supp.2d at 497–98. SDI did not send the Walters Memo to plaintiffs or other purchasers. *See* SAC ¶ 19.

On September 24, 1998, Enron Corp. presented a report to the NSM Management Company and the NSM Board (the "Enron Report"). *See id.* ¶ 21. The Enron Report "documented the substantial use of proceeds [from the offering] in ways not disclosed in the Offering Memorandum and a substantial shortage of funds necessary to complete the DRI and Finishing Facilities." *Id.* The Enron Report was not provided to plaintiffs or other investors.

during that deposition contradict SDI's response to plaintiffs' interrogatories, dated March 27, 2000. *See* Pl. SDI Opp. Mem. at 2.

*See id.* Soon after the Enron Report, NSM's Board asked for and received Schultes' resignation. *See id.* NSM bondholders were subsequently notified of this resignation in a conference call. *See id.* ¶ 22.

On October 13, 1998, SDI invited bondholders to attend a meeting at its headquarters. *See id.* Selin Cebeci and Burton Weinstein participated by telephone on behalf of plaintiffs. *See id.* At that meeting, Busse "provided information to the investors which revealed that the defendants' representations made prior to the offering were false and misleading." *Id.* The SAC details the statements made by Busse at the October 13 meeting:

> NSM Management Company did not have complete control of NSM's operations. "Not only did they not understand resource costs, or buy them in the right quantity, they had no financial controls." *Id.* ¶ 22(a).

> SDI never intended to play a significant role in the management of NSM. "I think most of you probably recognize that for legal and [inaudible] and some other reasons, SDI's role in this transaction was really that of an advisor, and most specifically, I think, that of a technical advisor." *Id.* ¶ 22(b).

> SDI had not verified the design of the Mini–Mill or its operating assumptions. *See id.* ¶ 22(c).

> The Hot Mill was not complete and through start-up and was not ready to begin commercial operations. "It can't operate. It doesn't have bricks and mortar, so to speak. It doesn't have the daily ingredients to operate a mill." *Id.* ¶ 22(d).

> The Hot Mill was not producing and had not produced quality steel. *See id.* ¶ 22(e).

> The offering did not provide NSM with sufficient capital to complete the DRI and Finishing Facilities and to operate the Mini–Mill, a fact known at the closing. *See id.* ¶ 22(f).

In a letter dated December 30, 1998, Busse notified NSM and NSM Management Company that SDI was terminating its licensing and advisory agreements with NSM (the "Busse Letter"). *See id.* ¶ 23. In his letter, Busse "noted that SDI had found a 'far less complete mill, with serious design flaws, without the wherewithal to complete the project as represented and, even if completed as represented, without the capacity to produce the output upon which the financial projections were predicated.'" *Id.* (quoting Busse Letter). Busse did not circulate his letter to plaintiffs or other NSM bondholders. *See id.*

"Since December 1998, the mill has been shut down; efforts to construct the DRI facilities have been abandoned; there are insufficient funds remaining to complete construction of the DRI and Finishing Facilities; a default has been declared by the bondholders; and there are no present restructuring plans or any realistic prospects for restructuring." *Id.* ¶ 24.

## B. Procedural History

On November 5, 1999, plaintiffs served an Amended Complaint on defendants NatWest Finance, McDonald and SDI. On May 8, 2000, this Court denied a joint motion by NatWest Finance and McDonald to dismiss the Amended Complaint. *See* Opinion, 94 F.Supp.2d at 500–08. In that same Opinion, SDI's motion to dismiss plaintiffs' claims against it for federal securities and common law fraud, as well as conspiracy to commit fraud, was granted but its motion to dismiss plaintiffs' claim for aiding and abetting fraud was denied. *See id.* at 508–12. Finally, plaintiffs were granted leave to amend the dismissed claims. *See id.* at 510–11.

On May 30, 2000, plaintiffs filed the SAC, which contains three changes relevant to the pending motions. *First,* plaintiffs attempted to cure the deficiencies in their claims against SDI. *Second,* plaintiffs added two new defendants—NatWest Capital and NatWest Bank—and alleged that those defendants acted as a single inte-

grated enterprise with existing defendant NatWest Finance. *Third,* plaintiffs stated a claim against NatWest Bank as a controlling person within the meaning of section 20 of the 1934 Act, 15 U.S.C. § 78t(a), with respect to the activities of NatWest Finance and NatWest Capital.[5] SDI, NatWest Capital and NatWest Bank now move to dismiss the SAC pursuant to Rules 9(b) and 12(b)(6).

## II. DISCUSSION

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris,* 186 F.3d at 247; *see also Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (quotation marks and citation omitted). Thus, to properly rule on such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences therefrom in the nonmovant's favor. *See Harris,* 186 F.3d at 247. Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (quotation marks and citation omitted).

### A. Motion to Dismiss Filed by SDI

#### 1. Section 10(b) claim

Section 10(b) of the 1934 Act states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 sets forth specific practices that are considered "manipulative or deceptive." *See* 17 C.F.R. § 240.10b–5. Among other things, Rule 10b–5 provides that "[i]t shall be unlawful ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim under section 10(b) and Rule 10b–5, plaintiffs must allege that in connection with the purchase or sale of securities: (1) defendants made a false material misrepresentation or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiffs detrimentally relied upon defendants' fraudulent acts. *See Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 534 (2d Cir.1999).

Securities fraud actions are subject to the heightened pleading requirements of Rule 9(b):

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b); *Chill v. General Electric Co.,* 101 F.3d 263, 267 (2d Cir.1996) ("[T]he actual fraudulent statements or

---

**5.** On June 5, 2000, defendant NatWest Finance filed a third-party complaint against John W. Schultes, Gabriel Capital Corporation, Selin Cebeci, Jack Mayer, Ezra Merkin, and John Does 1–50. All of the third-party defendants except Schultes have moved to dismiss NatWest Finance's third-party complaint. That motion will be addressed in a separate opinion.

conduct and the fraud alleged must be stated with particularity."). In addition, securities fraud actions are governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which contains its own heightened pleading requirements. The PSLRA states, in relevant part:

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant -

**(A)** made an untrue statement of a material fact; or

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b); *see Press,* 166 F.3d at 537–38 (explaining that the PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit"). Under the heightened pleading requirements of Rule 9(b) and the PSLRA, plaintiffs must allege the first two elements of a securities fraud claim—fraudulent acts and scienter—with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994) (heightened pleading requirement for fraudulent

acts); *Press,* 166 F.3d at 537–38 (heightened pleading requirement for scienter).

#### a. Material misrepresentations

#### i. February 23 Road Show

■ Plaintiffs' original § 10(b) claim against SDI was dismissed because plaintiffs had failed to allege that any misrepresentations made at the February 23 Road Show were attributed to SDI when they were communicated to plaintiffs. *See* Opinion, 94 F.Supp.2d at 508–10 ("The problem for plaintiffs is that the Amended Complaint does not allege that the misrepresentations were attributed to SDI at the time of their dissemination."). The Opinion cited the following passage from *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998):

> [A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act, as reliance only on representations made by others cannot itself form the basis of liability. Thus, the misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision.

(quotation marks and citation omitted).

In the SAC, plaintiffs have cured the deficiencies identified in the Opinion by specifically alleging that the representatives at the February 23 Road Show "reiterated to the plaintiffs' representatives statements made by Busse at the prior road shows, and attributed them to Busse and/or SDI." SAC ¶ 17. In addition, plaintiffs have satisfied the requirements of the PSLRA by identifying a number of specific statements made by Busse and repeated by the participants at the February 23 Road Show:

> In particular, Wheeler, Schultes and Heasley told plaintiffs that SDI had placed its imprimatur on the NSM project, and that SDI had said that the

NSM mill was 'first class;' that the technology being used was in essence SDI technology plus certain state-of-the-art technological advances over SDI's current process and equipment; that SDI would be actively involved; and that SDI had committed to having a presence in Thailand and participating in the management of the plant.

*Id.* Finally, plaintiffs allege that "[e]ven though Busse did not make the above misrepresentations directly to the plaintiffs, Busse and SDI knew or should have known that these misrepresentations would be communicated by the other defendants to the plaintiffs, and attributed to Busse and SDI." *Id.* Nevertheless, SDI makes a number of arguments as to why the misrepresentations alleged by plaintiffs are not actionable.

*First,* SDI argues that the statement that the NSM mill was "first class" is too vague to be actionable. The Second Circuit has recognized that vague expressions of optimism can be "too indefinite to be actionable under the securities laws." *In re IBM Corporate Securities Litigation,* 163 F.3d 102, 108 (2d Cir.1998); *see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 811 (2d Cir. 1996) (company's statements that it was "optimistic" about future earnings and "expected" its product to do well "cannot have misled a reasonable investor ... and cannot constitute actionable statements under the securities laws."). The "first class" statement, however, represents SDI's opinion of the Mini–Mill at that time, not an expression of optimism about its future. "[A]n opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without a basis in fact." *In re IBM,* 163 F.3d at 109. The SAC repeatedly alleges that SDI had serious concerns about the Mini–Mill prior to March 1998. *See* SAC ¶¶ 12(k), 12(y), 28(a), 28(i). Thus, plaintiffs have alleged that SDI did not genuinely or reasonably believe that the Mini–Mill was "first class"

when it made that statement. *Cf. In re IBM,* 163 F.3d at 109 (granting summary judgment in favor of defendants because "there is no evidence in the record to support a finding that these statements were made in bad faith or that the speakers did not genuinely and reasonably believe that they were accurate.").

■ *Second,* SDI argues that the statement that the Mini–Mill was employing "in essence SDI technology plus certain state-of-the-art technological advances" is not actionable because it is too vague and plaintiffs have failed to allege that it is untrue. The SAC states: "Busse, CEO of SDI, recognized prior to the offering and advised NSM, but failed to advise the plaintiffs or other investors, that the mill was not based on commercially proven technologies, but instead was a grand experiment." SAC ¶ 28(a). The SAC then lists a number of examples of experimental technology at the Mini–Mill. *See id.* The addition of the phrase "in essence" does not render this allegedly false statement too vague to be actionable.

■ SDI contends that neither statement is actionable because they are contradicted or clarified by unchallenged statements in the Offering Memorandum. The "bespeaks caution" doctrine, however, does not apply where a defendant knew that its statement was false when made. *See Milman v. Box Hill Systems Corp.,* 72 F.Supp.2d 220, 231 (S.D.N.Y.1999) ("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."); *see also Ruskin v. TIG Holdings, Inc.,* 98 Civ. 1068, 2000 WL 1154278, at \*7 (S.D.N.Y. Aug.14, 2000) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.") (quotation marks and citation omitted). Because plaintiffs allege that SDI knew its misrepresentations were false when made, *see* SAC ¶¶ 12(k), 12(y), 28(a), 28(i), the "bespeaks caution" doctrine provides no relief for SDI.

■ Alternatively, SDI contends that the alleged misrepresentations were not material because they would not have been "viewed by the reasonable investor as having significantly altered the total mix of information made available." *Simon De-Bartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 172 (2d Cir. 1999) (quotation marks and citation omitted). Plaintiffs argue that the alleged misrepresentations by SDI, which developed the mini-mill concept, played a significant role in their investment decision. *See* Pl. SDI Opp. Mem. at 6–7 ("Given SDI's status as the world's leading mini-mill operator—headed by the person who almost single-handedly changed the landscape of the steel industry with the mini-mill concept—it is not surprising that SDI's pronouncements were instrumental in convincing Gabriel to buy the bonds and makes them actionable."). At this stage, I cannot conclude that no reasonable investor would have been influenced by the alleged misrepresentations. *See Simon DeBartolo,* 186 F.3d at 172 ("The determination of materiality is a mixed question of law and fact that generally should be presented to a jury.") (quotation marks and citation omitted).

■ *Third,* SDI argues that the statements that it "would be actively involved" in the Mini–Mill and "had committed to having a presence in Thailand and participating in the management of the plant" are not actionable because plaintiffs have failed to allege that those statements are untrue. In fact, SDI contends that it was actively involved, did have a presence in Thailand and did participate in the management of NSM. Plaintiffs allege, in essence, that the statements were untrue because SDI intended to play a much smaller role in the Mini–Mill than the statements at issue would indicate. *See* SAC ¶¶ 12(k) ("SDI and the underwriter defendants had agreed that SDI would

have an extremely limited role in the NSM project and would have no management responsibilities whatsoever."); 22(b) ("Busse revealed that SDI had never intended to play a significant role in the management of NSM: 'I think most of you probably recognize that for legal and [inaudible] and some other reasons, SDI's role in this transaction was really that of an advisor, and most specifically, I think, that of a technical advisor.' "). The parties dispute the role SDI intended to play and actually played in the Mini–Mill. Because this factual dispute cannot be resolved at this stage in the proceedings, plaintiffs' allegations are sufficient to survive a motion to dismiss. *See Harris,* 186 F.3d at 247 ("On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff.").

■ *Fourth,* SDI argues that the statement that it had placed its "imprimatur" on the NSM project is too vague to be actionable. In response, plaintiffs argue that "the complaint now details statements made by Busse about SDI's role in the management of NSM and SDI's review of the Mill that were part and parcel of SDI's plan to create the appearance that SDI had given NSM its stamp of approval and would actively manage the facility." Pl. SDI. Opp. Mem. at 7. As explained in the Opinion and reemphasized above, however, plaintiffs may only base their claim against SDI on statements made to them and attributed to SDI. *See* Opinion, 94 F.Supp.2d at 508–09 ("[A] defendant does not have to make a misrepresentation directly to a plaintiff, so long as the defendant knows or should know that the misrepresentation will be communicated to the plaintiff. Nevertheless, the party communicating the misrepresentation must attribute that misrepresentation to the defendant.") (citations omitted).[6]

---

6. In *Wright,* the Second Circuit explained that this strict limitation was grounded in the reliance requirement. *See Wright,* 152 F.3d at

175 ("[R]eliance only on representations made by others cannot itself form the basis of liability.") (quotation marks and citation

Plaintiffs have identified specific statements made to them and attributed to SDI at the February 23 Road Show, and I have concluded that those statements are actionable. But plaintiffs cannot use their "imprimatur" allegation as a vehicle for holding SDI liable for statements made by Busse at road shows not attended by plaintiffs. *See* SAC ¶ 12(z) ("Busse's appearance at numerous road shows, the slides exhibited at road shows, Busse's comments regarding his own purported review of the plant and his favorable assessment of it compared to SDI, and the reiteration of those comments to prospective investors (including the plaintiffs) at the road shows he did not attend, falsely led investors to believe that SDI had put its 'stamp of approval' on NSM and had a valid basis for doing so, when neither was the case."). Because plaintiffs' "imprimatur" allegation is an impermissibly vague catch-all, it cannot survive a motion to dismiss.

### ii. Slides

■ Although plaintiffs identify specific slides that allegedly misrepresented SDI's role, *see* SAC ¶ 33(c), those slides cannot form the basis of a § 10(b) claim against SDI. Plaintiffs allege in their opposition brief that SDI reviewed the slides, *see* Pl. SDI Opp. Mem. at 2–3, but that allegation is insufficient. *See* Opinion, 94 F.Supp.2d at 510 ("At most, the Amended Complaint alleges that SDI knew that NatWest and McDonald would make misrepresentations to plaintiffs about its role in the Mini–Mill. What the Amended Complaint fails to allege is that the misrepresentations communicated to the plaintiffs by NatWest and McDonald were SDI's misrepresentations."). Plaintiffs do not allege that the misrepresentations on the slides were attributed to Busse, or that NatWest and McDonald were mere conduits for SDI, or that SDI actually participated in the drafting of the slides. *See* Opinion, 94 F.Supp.2d at 508–10 (explaining methods

omitted). The focus is on what plaintiffs knew when they purchased the Notes, not

by which a party can be held liable for a misrepresentation not made directly to plaintiff).

Rather, plaintiffs allege that NatWest and McDonald "prepared slides which were used at each road show and which contained ... representations made by Busse." SAC ¶ 12(j). If the misrepresentations were not attributed to Busse when they were communicated to plaintiffs, even if Busse had made those statements on some prior occasion, SDI cannot be held liable to plaintiffs for those slides under § 10(b). *See Wright,* 152 F.3d at 175 ("[R]eliance only on representations made by others cannot itself form the basis of liability.") (quotation marks and citation omitted). As demonstrated above, plaintiffs know how to allege that misrepresentations were attributed to SDI. *See* SAC ¶ 17 ("Wheeler, Schultes and Heasley reiterated to the plaintiffs' representatives statements made by Busse at the prior road shows, and attributed them to Busse and/or SDI."). They have failed to make such allegations concerning the slides.

### iii. Offering Memorandum

■ Plaintiffs also allege that SDI is responsible for material misrepresentations in the Offering Memorandum concerning its role in the Mini–Mill because "SDI participated in drafting and editing these portions of the Offering Memorandum, and permitted them to convey a misleading impression of SDI's role." SAC ¶ 12(x). SDI argues that plaintiffs have failed to identify any allegedly untrue statements regarding SDI's role. "To state a claim with the required particularity, a complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quotation marks and citation omitted).

what they learned after the fact.

Plaintiffs have identified two specific statements in the Offering Memorandum, drafted in part by SDI, which SDI itself thought were misleading:

A section of the draft Offering Memorandum entitled "Description of Project Participants" began with a description of SDI. In its review of the draft, "SDI circled the phrase 'Project Participants' and wrote the following: "Misleading! SDI is not a 'participant.'" The Offering Memorandum was never changed.

A section of the draft Offering Memorandum entitled "Description of Material Agreements" summarized the SDI Agreement. SDI's comments on this section stated: "Nothing here about operating the Mill. Should be added." In the final Offering Memorandum, however, "nothing was added to clarify that SDI had no responsibility for operating the mill, permitting the continued perpetration of the misleading impression that SDI would have direct management responsibility."

SAC ¶ 12(x). SDI argues that those statements are neither misleading nor material in the context of the Offering Memorandum as a whole. Those arguments, however, cannot be resolved at this stage of the proceedings. "The determination of materiality is a mixed question of law and fact that generally should be presented to a jury. The total mix of information available and the relevant circumstances must be considered." *Press,* 166 F.3d at 538 (citations omitted); *see also Geiger v. Solomon–Page Group, Ltd.,* 933 F.Supp. 1180, 1184 (S.D.N.Y.1996) ("The question of materiality may be decided as a matter of law on a motion to dismiss if the alleged omission is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of its importance.") (quotation marks and citation omitted). Drawing all reasonable inferences in plaintiffs' favor, the alleged misrepresentations regarding the SDI Agreement and its role in the Mini–Mill might have been misleading and material.

In addition, plaintiffs make a more general allegation concerning SDI's failure to disclose material information in the Offering Memorandum:

In addition to drafting and editing portions of the Offering Memorandum, SDI also requested and was given the opportunity to review and comment on the Offering Memorandum before it became final. Through this process, SDI caused the Offering Memorandum to mislead the plaintiffs about the actual level of involvement that SDI intended to have with NSM. In particular, SDI did not disclose that it had rejected an active management role in NSM; that it had strictly limited the scope of its services to be advisory only; that it did *not* intend to be involved in the day-to-day operations or management of the plant; that it had contractually disclaimed any such responsibilities; that it was not a 'managing owner' as stated in the slides; that it was not a 'strategic equity investor' as the slides purported; that it had not verified the concept and operating assumptions of the Mill as the slides represented; that Busse's alleged 'review' of the plant had occurred in May 1997, at the very early stages of construction and months before the plant was completed or operational; that notwithstanding this limited review, Busse and SDI had significant concerns about the design and operating assumptions for the project; and that SDI had contractually disavowed any review or analysis of the design or operating assumptions.

SAC ¶ 12(y). In essence, plaintiffs seek to hold SDI liable for not using the Offering Memorandum to correct statements made by Busse and others at road shows not attended by plaintiffs. As I have emphasized repeatedly, however, statements made by SDI at road shows not attended by plaintiffs cannot support a claim against SDI, unless those statements were communicated to plaintiffs and attributed to SDI before they purchased the Notes.

*See* Opinion, 94 F.Supp.2d at 508–10. Plaintiffs have sufficiently alleged that some of SDI's misrepresentations were communicated to them and attributed to SDI at the February 23 Road Show. *See supra* Part II.A.1.a.i. If plaintiffs can demonstrate that specific portions of the Offering Memorandum were misleading because of those misrepresentations, then they can hold SDI liable for failing to correct those sections of the Offering Memorandum. *See* 17 C.F.R. § 240.10b–5 ("It shall be unlawful … to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."). They cannot, however, hold SDI liable for failing to use the Offering Memorandum to correct misrepresentations not made to them before they purchased the Notes.

### b. Scienter

Because plaintiffs have sufficiently alleged that SDI made several material misrepresentations, the next question is whether plaintiffs pleaded scienter with sufficient particularity. In order to satisfy this requirement,

> plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (quotations marks and citations omitted).

### i. Motive and opportunity

■ The Second Circuit recently summarized the relevant standard:

> Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000), *petition for cert. filed*, (Sept. 19, 2000) (No. 00–432). Plaintiffs contend that SDI had three motives to commit the alleged fraud: (1) an annual fee of $2,000,000 and a one-time fee of $1,300,000; (2) a 10% shareholder interest in NSM; and (3) a license to use the Mini–Mill's experimental technology. *See* SAC ¶ 46. SDI argues that none of these motives are sufficient because the receipt of fees alone is inadequate and because the other two motives could not be achieved by participating in a fraud. If the entire Mini–Mill was a sham, SDI's 10% interest would be worthless and it never would have had the opportunity to see the experimental technology in action. *See Shields*, 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.").

On a motion to dismiss, however, the court must draw all reasonable inferences in the nonmovant's favor. *See Harris*, 186 F.3d at 247 ("The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."). Plaintiffs argue that they are "not alleging that SDI knew that [the Mini–Mill's] prospects were doomed. [Plaintiffs are] alleging that SDI knew that there were questionable aspects of the mill's design, that the technology was largely unproven, and that disclosing those facts to investors would have doomed the offering—thereby preventing SDI from earning millions of dollars and otherwise benefitting from NSM's grand experiment with other people's money." Pl. SDI Opp. Mem. at 17 n. 11; *see also id.* at 16 ("In effect, SDI was to get the benefit of a half-billion-dollar investment in new, unproven technology on someone else's nickel."). Under plain-

tiffs' theory, SDI would receive concrete benefits by misrepresenting the state of the Mini–Mill, even if it turned out to be a failure, and had the opportunity to make such misrepresentations at the road shows. *See Novak*, 216 F.3d at 307–08 ("[P]laintiffs had to allege that defendants benefitted in some concrete and personal way from the purported fraud."). Accordingly, plaintiffs have sufficiently plead motive and opportunity.

### ii. Conscious misbehavior or recklessness

■ The Second Circuit has stated: [R]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.

*Chill*, 101 F.3d at 269 (quotation marks and citations omitted). Recently, however, the Second Circuit noted that "these general standards offer little insight into precisely what actions and behaviors constitute recklessness sufficient for § 10(b) liability." *Novak*, 216 F.3d at 308. The court then explained:

[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

*Id.*

Plaintiffs' allegations satisfy that standard. Taking the facts alleged in the SAC

as true, SDI represented that the Mini–Mill was "first class" despite its serious concerns, stated that the Mini–Mill was employing "in essence SDI technology plus certain state-of-the-art technological advances" despite its knowledge that the Mini–Mill was based on experimental technology, and vastly overstated its intended role in the management and day-to-day operations of the Mini–Mill. *See* SAC ¶¶ 12(k), 12(y), 28(a), 28(i). Those facts are sufficient to plead scienter based on recklessness. *See In re Carter–Wallace, Inc. Securities Litigation*, 220 F.3d 36, 40 (2d Cir.2000) ("It is sufficient for appellants to allege 'defendants' knowledge of facts or access to information contradicting their public statements.' ") (quoting *Novak*, 216 F.3d at 308); *see also* Opinion, 94 F.Supp.2d at 505–06 (collecting cases where plaintiffs successfully alleged conscious misbehavior or recklessness).[7]

SDI argues that its disclosure of problems at the Mini–Mill, first to NSM in August 1998 and then to bondholders in October 1998, negate any evidence giving rise to a strong inference of fraudulent intent. In support, SDI cites *Griffin v. McNiff*, 744 F.Supp. 1237 (S.D.N.Y.1990), *aff'd*, 996 F.2d 303 (2d Cir.1993), in which the court granted a motion to dismiss by an accounting firm that had withdrawn its reports and tax opinions in an allegedly fraudulent scheme. In *Griffin*, however, the court specifically noted that the accounting firm had no knowledge of the alleged fraud when it issued its reports and tax opinions:

[A]t best, the Second Amended Complaint alleges that Price Waterhouse became aware of these deficiencies in January of 1983. Subsequently, Price Waterhouse acted to inform the general partners of its concern, withdraw its re-

---

7. The parties dispute whether the court should consider all of SDI's alleged misrepresentations (including those made to other investors) in determining whether plaintiffs have established a strong inference of fraud-

ulent intent. Because I conclude that the misrepresentations made to plaintiffs are sufficient to establish recklessness, I need not resolve that question.

ports and tax opinion letters, and ensure that the investors were notified of the reasons behind its withdrawal. These allegations simply do not support a strong inference of scienter. If anything, they indicate exactly the opposite: that Price Waterhouse did not know of the alleged wrongdoing during the offerings of the partnerships.

*Id.* at 1250. In this case, by contrast, plaintiffs allege that SDI knew about problems at the Mini–Mill when it made its misrepresentations. *Cf. id.* at 1249 ("Plaintiffs, rather than providing facts to buttress their allegations of scienter, allege facts which substantially undercut the strength of any inference of scienter that might be drawn from Price Waterhouse's conduct.").

 Nevertheless, SDI contends that plaintiffs have failed to offer an explanation of its disclosures that supports a strong inference of fraudulent intent. *See* Memorandum of Law in Support of Defendant Steel Dynamics, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint at 17 ("It is nonsense for plaintiffs to contend that, a few short months after the close of the NSM offering, [SDI] first accused itself of committing securities fraud in a non-privileged memorandum to NSM's counsel, and then revealed the facts underlying its securities fraud to all of the bondholders during a meeting at [SDI's] own corporate headquarters."). Clearly, one reasonable inference to draw from SDI's disclosures is that SDI lacked any fraudulent intent and, upon learning of the problems at the Mini–Mill, promptly disclosed them to NSM and then to the bondholders. Plaintiffs argue, however, that SDI made its disclosures in an effort to distance itself from the fraudulent scheme. *See* Pl. SDI Opp. Mem. at 15 n. 10 ("An equally plausible argument—and one Gabriel believes to be the case—is that once the fraud began to unravel, SDI embarked on a scheme to distance itself from the problem by appearing to be an innocent player."). This is another reasonable inference to be drawn from the facts alleged in the SAC. Because every inference must be drawn in plaintiffs' favor, the motion to dismiss must be denied. *See Press,* 166 F.3d at 538 ("The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences.").[8]

#### c. Conclusion

Plaintiffs have cured the deficiencies identified in the Opinion and sufficiently stated a § 10(b) claim against SDI. As a result, SDI's motion to dismiss must be denied.

### 2. State law claims

 Plaintiffs' common law fraud claim against SDI was dismissed because plaintiffs had failed to adequately plead their federal securities fraud claim. *See* Opinion, 94 F.Supp.2d at 511. Because plaintiffs have cured the deficiencies in the federal securities fraud claim, their common law fraud claim also survives. *See Scone Investments, L.P. v. American Third Market Corp.,* No. 97 Civ. 3802, 1998 WL 205338, at *10 (S.D.N.Y. Apr.28, 1998) ("[T]he elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under

---

8. The parties did not address the third prong—reliance—but the SAC does contain a reliance allegation. *See* SAC ¶ 18 ("The plaintiffs reviewed and relied upon the written materials provided to them by the defendants, as well as the oral representations made by the defendants, in making the decision to invest in the NSM Notes."). To the degree that SDI argues that any alleged misrepresentations were not material because plaintiffs could not justifiably rely upon them, plaintiffs have sufficiently alleged SDI's prominence as the creator of the mini-mill concept. *See id.* ¶ 17 (alleging that participants at the February 23 Road Show "spoke to plaintiffs' representatives extensively about SDI and Busse, educating the plaintiffs as to SDI's preeminent position in the mini-mill industry and Busse's key role in starting up SDI and managing it successfully."); *see also supra* Part II.A.1.a.i.

§ 10(b) and Rule 10b–5."). In addition, SDI argues that plaintiffs' claims for conspiracy to commit fraud and aiding and abetting fraud should be dismissed because plaintiffs failed to allege scienter. As explained above, however, plaintiffs' allegations of scienter are sufficient. *See supra* Part II.A.1.b. SDI's motion to dismiss plaintiffs' state law claims for common law fraud, conspiracy to commit fraud and aiding and abetting fraud is therefore denied.

### B. Motions to Dismiss Filed by NatWest Bank and NatWest Capital

Plaintiffs seek to hold both NatWest Bank and NatWest Capital liable under § 10(b) for the allegedly fraudulent acts of NatWest Finance, either because NatWest Finance was the agent of NatWest Bank or because the corporate veils of NatWest Finance and NatWest Capital should be pierced. Both NatWest Bank and NatWest Capital argue that neither agency nor veil-piercing liability is viable after *Central Bank of Denver, N.A. v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), and that plaintiffs have failed to plead the elements of each theory. In addition, plaintiffs allege that NatWest Bank is liable as a controlling person under § 20(a) for the primary violation committed by NatWest Finance.

Because plaintiffs' three theories of liability—agency, veil-piercing and controlling person—raise some common issues and because the arguments of NatWest Bank and NatWest Capital substantially overlap, I will consider both motions in a single section.

### 1. Section 20(a) claim

Section 20(a) states:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quotation marks and citation omitted). Plaintiffs have satisfied the first element by stating a Rule 10b–5 claim against NatWest Finance. *See* Opinion, 94 F.Supp.2d at 500–08.[9]

"Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2). To survive a motion to dismiss, a plaintiff need only plead facts sup-

9. Throughout the SAC, plaintiffs refer to all three NatWest defendants as "NatWest," thereby making it difficult to determine which NatWest defendant employed the people who made the alleged misrepresentations at the February 23 Road Show. At the time of the Opinion, however, NatWest Finance was the only NatWest defendant in the case. *See* Opinion, 94 F.Supp.2d at 494 (referring to NatWest Finance as "NatWest"). My conclusion that plaintiffs had stated a § 10(b) claim against NatWest Finance was premised in part on the fact that the people who made the alleged misrepresentations at the February 23 Road Show represented NatWest Finance. *See id.* at 501–05 (discussing allegations of fraudulent acts). If plaintiffs misidentified the people at the February 23 Road Show, they should bring those facts to the Court's attention because the corrected allegations may support a claim for primary liability, rather than control person liability.

porting a reasonable inference of control. *See Mishkin v. Ageloff,* 97 Civ. 2690, 1998 WL 651065, at *26 (S.D.N.Y. Sep.23, 1998) (requiring only a reasonable inference of control); *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 205 (E.D.N.Y.1997) (same). Plaintiffs have satisfied their burden. The SAC pleads sufficient facts to support a reasonable inference that NatWest Bank had the power to direct the management or policies of NatWest Finance. *See* SAC ¶¶ 6(a)-(e).

Noting that the meaning of the third element—culpable participation—is "less than clear," plaintiffs argue that "any requirement to plead 'culpable participation' must equate with something less than allegations of knowledge or participation in the fraud, or even that the defendant failed to maintain or enforce reasonable internal controls." Plaintiffs' Combined Memorandum in Opposition to Motions of Defendants National Westminster Bank PLC and NatWest Capital Markets Limited to Dismiss at 23–24. NatWest Bank, on the other hand, urges this Court to apply the same standard for culpable participation under § 20(a) as for scienter under § 10(b). *See* Reply Memorandum of Law in Support of Defendant National Westminster Bank PLC's Motion to Dismiss Second Amended Complaint at 5–6 ("[T]o allege culpable participation, a complaint must plead specific facts demonstrating a 'strong inference' that a defendant intentionally or knowingly took affirmative steps in furtherance of the primary fraud.") (quoting 15 U.S.C. § 78u–4(b)(2)). The Second Circuit has not addressed this issue, other than to state that "a determination of § 20(a) liability requires an individualized determination of a . . . defendant's particular culpability." *Boguslavsky,* 159 F.3d at 720.[10]

Because the culpable participation element requires plaintiffs to prove the controlling person's state of mind, it is subject to the PSLRA's heightened pleading standards. *See* 15 U.S.C. § 78u–4(b)(2) ("In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). In order to survive a motion to dismiss, therefore, plaintiffs must state with particularity facts giving rise to a strong inference that NatWest Bank in some meaningful sense culpably participated in NatWest Finance's primary violation. *See Mishkin,* 1998 WL 651065, at *23 ("[B]ecause a section 20(a) plaintiff must ultimately establish a defendant's state of mind, the PSLRA requires a plaintiff, at the pleading stage, to allege particular facts that give rise to a 'strong inference' of the requisite state of mind."); *see also Ruskin v. TIG Holdings, Inc.,* 98 Civ. 1068, 2000 WL 1154278, at *7 (S.D.N.Y. Aug.14, 2000) (holding that the PSLRA heightened the standard for pleading the required state of mind under § 20(a)); *In re Livent, Inc. Securities Litigation,* 78 F.Supp.2d 194, 222 (S.D.N.Y.1999) (granting motion to dismiss because "the Complaint does not allege particularized facts as to the Outside Directors' 'culpable participation' in the fraud").

The more difficult question is what plaintiffs must allege in order to satisfy that burden. *See Mishkin,* 1998 WL 651065, at *25 ("Attempting to divine the distinctions between a 'strong inference,' 'strong circumstantial evidence of con-

---

10. This lack of guidance may stem from the fact that, until recently, it was not firmly established that a plaintiff had to plead culpable participation in order to survive a motion to dismiss. *See Mishkin,* 1998 WL 651065, at *22 ("Although one would think, and hope, that the standard to be applied to a motion to

dismiss a section 20(a) claim is well-established, the opposite is all too unfortunately the case."); *see also First Jersey,* 101 F.3d at 1472 (including culpable participation as part of a plaintiff's prima facie case under § 20(a)).

scious misbehavior,' and being 'in some meaningful sense [a] culpable participant,' is, as Judge Newman observed in an entirely unrelated context, 'an inquiry in the class of angelic terpsichore on heads of pins.'") (citations omitted). In *Mishkin*, Judge Loretta Preska of this Court applied the same standard for proving scienter as required by § 10(b). *See Mishkin*, 1998 WL 651065, at *25 ("I see no good reason to apply one strong inference standard to section 10(b) claims and another strong inference standard to section 20(a) claims."); *see also In re Sotheby's Holdings, Inc.*, 00 Civ. 1041, 2000 WL 1234601, at *8 (S.D.N.Y. Aug.31, 2000) (holding that plaintiff failed to plead required state of mind under § 20(a) because plaintiff failed to plead required state of mind under § 10(b)); *In re Livent, Inc.*, 78 F.Supp.2d at 222 (same). But Judge Preska applied only a portion of that standard, stating that a plaintiff must allege "particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud." *Mishkin*, 1998 WL 651065, at *25.[11] Judge Preska then concluded that the plaintiff had failed to "adequately allege what Ageloff did in the course of exercising ... control." *Id.* at *26.

Under § 10(b), however, a plaintiff must allege conscious misbehavior or recklessness. *See Acito*, 47 F.3d at 52. Recklessness adds an important dimension to the § 10(b) analysis, because it allows a plaintiff to plead that the defendant knew or should have known that it was misrepresenting material facts. *See Novak*, 216 F.3d at 308; *see also supra* Part II.A.1.b.ii. Applying that standard to § 20(a), plaintiffs can satisfy their burden by pleading facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct. *See In re*

*Twinlab Corporation Securities Litigation*, 103 F.Supp.2d 193, 208 (E.D.N.Y. 2000) (dismissing § 20(a) claim because "[p]laintiffs do not specifically allege facts demonstrating that the officers of Twinlab culpably participated in the scheme, rather than, for example, unknowingly approving credible but fraudulent financial reports prepared by subordinates."). By failing to exercise its control to prevent the primary violation, the controlling person is "in some meaningful sense a culpable participant in the primary violation." *Boguslavsky*, 159 F.3d at 720 (quotation marks and citation omitted).

Several cases applying the culpable participation standard in the wake of *First Jersey* rely on both the controlling person's fraudulent conduct and that person's knowledge of someone else's fraud to conclude that the culpable participation element has been satisfied. *See Ruskin*, 2000 WL 1154278, at *7 (complaint sufficiently alleged culpable participation by stating in part: "As Chairman and CEO of TIG Re, as well as a Director of TIG, Clark knew or should have known that TIG's public statements which he made or which he had responsibility to supervise, and TIG's public reports for which he had responsibility to supply data and information and to determine the final presentation, were false and misleading as more fully alleged herein."); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 143 (S.D.N.Y.1999) (denying motion to dismiss § 20(a) claim where defendants "held high level management positions in which they were involved in the day-to-day operations of Oxford, were aware of the internal control and accounting problems, were members of the Board, held substantial equity interest in Oxford, allegedly participated directly in disseminating the false and misleading financial statements and other statements, and traded while in possession of material non-

11. Although no court in this district has adopted the *Mishkin* standard, courts in other districts have done so. *See In re Equimed, Inc.*, 98–CV–5374, 2000 WL 562909, at *10 (E.D.Pa. May 9, 2000) ("'[A] plaintiff must

plead particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud.'") (quoting *In re Cendant Corp. Securities Litigation*, 76 F.Supp.2d 539, 549 n. 5 (D.N.J.1999)).

public information."). But a controlling person does not have to be a § 10(b) actor in order to culpably participate in the primary violation. Rather, a controlling person is liable under § 20(a) if that person: (a) knew or should have known that the primary violator, over whom the person had control, was engaged in fraudulent conduct but (b) took no steps to prevent the primary violation. *See Gordon v. Burr,* 506 F.2d 1080, 1086 (2d Cir.1974) (reversing finding of control person liability because "[w]e fail to find in the record support for a finding that P.A.W. had knowledge of the fraudulent representations or in any meaningful sense culpably participated in them."); *see also Chill,* 101 F.3d at 269 ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness.") (quotation marks and citation omitted).

▪▪▪ Plaintiffs have plead particularized facts sufficient to survive a motion to dismiss. The SAC alleges that NatWest Bank approved NatWest Finance's role in the Note offering only after imposing conditions designed to mitigate the serious risks of the transaction. *See* SAC ¶ 6(e) (describing how NatWest Bank's Group Risk division "limited the after-market trading permitted in the Notes and required that the bonus pool for the personnel involved in the transaction be reduced by any losses incurred in the Note transaction."). In addition, the SAC asserts that NatWest Bank received a total of $400,000,000 from plaintiffs and other investors. *See id.* ¶ 6(g). Finally, plaintiffs have plead that the roles of NatWest Bank and NatWest Finance intermingled at various points during the marketing, sale and underwriting of the notes. *See id.* ¶ 6(f). With all reasonable inferences drawn in their favor, plaintiffs have sufficiently alleged that NatWest Bank knew or should have known that NatWest Finance was engaging in fraudulent conduct and failed to exercise its control to prevent that fraud. *See Harris,* 186 F.3d at 247 ("The

district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

## 2. Section 10(b) claim

### a. Agency

▪▪▪ In *Central Bank,* the Supreme Court held that private plaintiffs cannot bring claims under § 10(b) for aiding and abetting securities fraud. *See Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439. Focusing on the text of § 10(b), the Court stated:

As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.

*Id.* at 177–78, 114 S.Ct. 1439 (citations omitted). The Court then explained that allowing aiding and abetting liability under § 10(b) would enable plaintiffs to state a claim without meeting all the required elements:

Our reasoning is confirmed by the fact that respondents' argument would impose 10b-5 aiding and abetting liability when at least one element critical for recovery under 10b-5 is absent: reliance. A plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b-5. Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions. Allowing plaintiffs to circumvent the reliance requirement would disregard the careful

limits on 10b–5 recovery mandated by our earlier cases.

*Id.* at 180, 114 S.Ct. 1439 (citations omitted). Finally, the Court noted that plaintiffs still could assert claims for secondary liability under § 20(a). *See id.* at 184, 114 S.Ct. 1439 ("Congress did not overlook secondary liability when it created the private rights of action in the 1934 Act.... The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere.").

In his dissent, Justice Stevens warned about the possible breadth of the Court's holding:

> The Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for conspiring to violate § 10(b) and Rule 10b–5. Secondary liability is as old as the implied right of action under § 10(b) itself; the very first decision to recognize a private cause of action under the section and rule ... involved an alleged conspiracy. In addition, many courts, concluding that § 20(a)'s 'controlling person' provisions, 15 U.S.C. § 78t, are not the exclusive source of secondary liability under the Exchange Act, have imposed liability in § 10(b) actions based upon respondeat superior and other common-law agency principles. These decisions likewise appear unlikely to survive the Court's decision.

*Id.* at 200 n. 12, 114 S.Ct. 1439 (Stevens, J., dissenting) (citations omitted). Four years later, the Second Circuit demonstrated Justice Stevens' prescience by holding that *Central Bank* "applies not only to aiding and abetting claims, but to conspiracy claims as well." *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841 (2d Cir.1998). Applying the reasoning of *Central Bank,* the Second Circuit concluded that "[j]ust as an aiding and abetting cause of action would have impermissibly permitted liability to be imposed in the absence of any showing of reliance, a conspiracy cause of action would similarly render irrelevant the question whether plaintiffs relied on any misstatements or omissions by the defendant being sued." *Id.* at 843 (citation omitted).

The Second Circuit has never addressed whether *Central Bank* bars a plaintiff from relying on agency principles to state a claim under § 10(b), and courts in this district have disagreed on the answer. *See Vento & Company of New York, LLC v. Metromedia Fiber Network, Inc.,* 97 Civ. 7751, 1999 WL 147732, at *12 (S.D.N.Y. Mar.18, 1999) (collecting cases). I agree with those courts that have held that agency liability must survive *Central Bank* in order to ensure that corporations remain subject to § 10(b). *See Vento,* 1999 WL 147732, at *13 ("Indeed, if *Central Bank* had precluded the liability of a principal for the misconduct of its agent, that decision would have prevented any liability by corporations or partnerships under Rule 10b–5 since such legal entities can only act through their natural agents."); *In re ICN/Viratek Securities Litigation,* 87 Civ. 4296, 1996 WL 164732, at *6 (S.D.N.Y. Apr.9, 1996) ("If claims of agency such as these did not give rise to primary liability ..., then a corporation, acting with scienter, could use an analyst, acting without scienter, as its agent to make false statements to the market, and neither the analyst nor the corporation would be liable under § 10(b).").

Nevertheless, the continuing vitality of agency liability must be reconciled with the concern expressed by the Supreme Court and Second Circuit that a defendant not be held liable as a primary violator under § 10(b) without an adequate showing of reliance. *See Central Bank,* 511 U.S. at 180, 114 S.Ct. 1439; *Dinsmore,* 135 F.3d at 843. The solution is provided by *Wright v. Ernst & Young, LLP,* 152 F.3d 169 (2d Cir.1998), in which the Second Circuit discussed the scope of liability for secondary actors under § 10(b):

There is no requirement that the alleged violator directly communicate misrepresentations to investors for primary liability to attach. However, contrary to Wright's argument, a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act, as reliance only on representations made by others cannot itself form the basis of liability. Thus, the misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision.

*Id.* at 175 (quotation marks and citations omitted). Applying the logic of *Wright* to agency liability, a principal can be liable under § 10(b) for the misrepresentations of its agent only if the person to whom the misrepresentations were made knows that the agent is acting under the actual or apparent authority of the principal. By explaining her authority to the listener, the agent essentially attributes the misrepresentations to the principal.

This formulation tracks the holding in *Vento,* the only post-*Wright* case to discuss agency liability after *Central Bank.* Although he did not mention *Wright,* Judge John Koeltl of this Court relied in part on the fact that the agent informed the plaintiff that he was acting on behalf of the principal. *See Vento,* 1999 WL 147732, at *13 ("Silverman also allegedly told Vento that he was going to represent the Kramer defendants in the transaction."). In addition, this formulation is in accordance with the Second Circuit's decision in *Wright* to emphasize "the absence of any mention of Ernst & Young in BT's press release" rather than "what the market might have implicitly 'understood' about Ernst & Young's involvement in that press release." *Wright,* 152 F.3d at 176–77; *see also In re*

*Fidelity/Micron Securities Litigation,* 964 F.Supp. 539, 544 (D.Mass.1997) ("To hold Magellan liable under Rule 10b–5 on a theory of respondeat superior would impose liability without any showing that the market relied on statements or actions directly or indirectly attributable to Magellan in evaluating Micron shares.").

Plaintiffs have failed to allege that NatWest Finance told them that it was NatWest Bank's agent while it was making the fraudulent statements. In fact, the SAC alleges exactly the opposite:

> In reality, [NatWest Finance] and [NatWest Capital] were mere instrumentalities and the alter egos of NatWest Bank, and acted as agents of NatWest Bank in the marketing, sale and underwriting of the Notes. *The relationship between these entities and the role of NatWest Bank in the underwriting of these notes was not disclosed to the plaintiffs at the time the Notes were sold* and was not reasonably discoverable by the plaintiffs before initiation of this action and the production of documents by [NatWest Finance].

SAC ¶ 6(h) (emphasis added). There is absolutely no indication that plaintiffs thought that NatWest Finance was the agent for NatWest Bank when they purchased the Notes. As a result, plaintiffs cannot hold NatWest Bank liable under § 10(b) for the acts of its alleged agent, because they did not rely on any misrepresentations attributable to NatWest Bank.

### b. Piercing the corporate veil

NatWest Bank and NatWest Capital also contend that *Central Bank* bars plaintiffs' attempt to pierce the corporate veils of NatWest Finance and NatWest Capital, because veil-piercing liability lacks both the reliance and scienter requirements of a § 10(b) claim.[12] Plaintiffs, for

12. It is not clear whether plaintiffs seek to pierce the corporate veil of NatWest Capital as well as NatWest Finance. The parties do not analyze the issue in those terms by addressing, for example, the requirements under English law for piercing the veil of an English corporation. *See infra* note 13. On the other hand, plaintiffs do allege that "[NatWest Finance] and [NatWest Capital] were mere in-

their part, assert that veil-piercing liability survived *Central Bank* because that doctrine simply means that two or more corporations acted as a single economic entity. Neither party cited—and my research failed to discover—any cases discussing this precise issue.

There is no question that veil-piercing liability is vicarious liability. *See Thomson–CSF, S.A. v. American Arbitration Association,* 64 F.3d 773, 777 (2d Cir.1995) ("In some instances, the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other."); *see also* 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10, at 577–78 ("A finding of fact of alter ego . . . merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation."). Because a parent corporation is being held legally accountable for the acts of its subsidiary, there is a danger that veil-piercing liability could run afoul of *Central Bank. See Central Bank,* 511 U.S. at 200, 114 S.Ct. 1439 ("[T]he majority's approach to aiding and abetting at the very least casts serious doubt, both for private and SEC actions, on other forms of secondary liability that, like the aiding and abetting theory, have long been recognized by the SEC and the courts but are not expressly spelled out in the securities statutes.") (Stevens, J., dissenting).

Nevertheless, the theory behind veil-piercing liability requires that such liability survives *Central Bank.* Courts will not pierce the corporate veil separating a parent and subsidiary unless "the two corporations operated as a single economic entity such that it would be inequitable . . . to uphold a legal distinction between them." *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1458 (2d Cir.1995) (quotation marks and citations omitted); *see also* 1 *Fletcher Cy-*

*clopedia,* § 41.20, at 596 ("The alter ego doctrine is applied to avoid the inequity of one corporation using another corporation to shield itself from liability."). The corporate veil is pierced because the parent corporation was, in reality, the party responsible for the allegedly fraudulent conduct. *See Union Carbide Corp. v. Montell N.V.,* 944 F.Supp. 1119, 1144 (S.D.N.Y. 1996) ("Plaintiff must show that the owners exercised complete domination of the corporation in respect to the transaction attacked."). As one Delaware court explained:

> [T]he corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. This . . . ground for disregarding the separateness of corporate entities is consistent with the general principle that this Court may regard a corporate parent as the sole party in interest where equitable considerations require it.

*Mabon, Nugent & Co. v. Texas American Energy Corp.,* Civ. A. No. 8578, 1990 WL 44267, at *5 (Del.Ch. Apr.12, 1990) (citations omitted).

Any lingering concern about veil-piercing liability after *Central Bank* is alleviated by the fact that plaintiffs must meet a high standard before such liability can attach. *See Fletcher,* 68 F.3d at 1458 ("A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a difficult task.") (quotation marks and citation omitted); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club International, Inc.,* 2 F.3d 24, 26 (2d Cir. 1993) ("New York is reluctant to pierce corporate veils.") (quotation marks and citation omitted). Once a court has taken the dramatic step of abolishing the legal distinction between a parent and its subsidiary, it is not inequitable to conclude that the parent possessed the requisite scienter and that the statements of its subsidiary can be attributed to it. At that

strumentalities and the alter egos of NatWest Bank." SAC ¶ 6(h).

point, the parent corporation is the primary violator.

■ Because NatWest Finance is a Delaware corporation, Delaware law governs whether its corporate veil should be pierced. *See Fletcher,* 68 F.3d at 1456–57 (explaining that, under New York choice of law principles, law of place of incorporation determines whether the corporate form will be disregarded). The Second Circuit recently explained the relevant standard under Delaware law:

> Delaware law permits a court to pierce the corporate veil of a company where there is fraud or where it is in fact a mere instrumentality or alter ego of its owner. Although the Delaware Supreme Court has never explicitly adopted an alter ego theory of parent liability for its subsidiaries, lower Delaware courts have applied the doctrine on several occasions, as has the United States District Court for the District of Delaware. Thus, under an alter ego theory, there is no requirement of a showing of fraud. To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness ... is present.

*Id.* at 1457 (quotation marks and citations omitted).[13]

NatWest Bank and NatWest Capital contend that plaintiffs' allegations must satisfy Rule 9(b) because they seek to pierce the corporate veil in the context of alleging fraud. "[W]hether a complaint which seeks to pierce the corporate veil is subject to Rule 9(b) is a knotty question[, on which] courts in this district have differed." *Old Republic Insurance Co. v. Hansa World Cargo Service, Inc.,* 170 F.R.D. 361, 374 (S.D.N.Y.1997) (collecting cases). Some courts have held that Rule 9(b) does not apply "because a veil piercing claimant can prevail without proving fraud." *Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 122 (S.D.N.Y. 1996); *see also Old Republic,* 170 F.R.D. at 375 (same); *Alter v. Bogoricin,* 97 Civ. 0662, 1997 WL 691332, at *5 (S.D.N.Y. Nov.6, 1997) (same). Others have held that Rule 9(b) should be applied if the plaintiff's underlying claim is a fraud claim. *See Kolbeck v. LIT America, Inc.,* 923 F.Supp. 557, 569 (S.D.N.Y.1996) ("The requirement of precision [in Rule 9(b) ] applies equally when the goal is to hold defendants vicariously liable for the fraud of another and when the agency relationship itself allegedly is part of the fraud."), *aff'd,* 152 F.3d 918 (2d Cir.1998); *Pits, Ltd. v. American Express Bank Int'l,* 911 F.Supp. 710, 715 (S.D.N.Y.1996) ("A different standard will be applied in determining whether the existence of an alter ego has been properly pled, depending on whether fraud or another claim is levelled.... The claims based in fraud—securities fraud and common law fraud—require a higher degree of specificity in pleading and, therefore, those claims will be dismissed against Limited.").

■ The heightened pleading requirement of Rule 9(b) applies to plaintiffs' attempt to pierce the corporate veil because their underlying allegations all relate to fraud—securities fraud, common law fraud, conspiracy to commit fraud, and

---

**13.** The parties did not discuss the applicable law for piercing the corporate veil of NatWest Capital, an English corporation. "English law ... will pierce the corporate veil and recognize one entity as the alter ego of another only where special circumstances exist indicating that the relationship of one corporation to another is a mere facade concealing the true facts." *Great Lakes Overseas, Inc. v. Wah Kwong Shipping Group, Ltd.,* 990 F.2d 990, 997 (7th Cir.1993) (quotation marks and citation omitted); *see also United Trade Associates Ltd. v. Dickens & Matson (USA) Ltd.,* 848 F.Supp. 751, 760 (E.D.Mich.1994) ("Unlike American law, English case law does not provide an enumerated set of factors that a court can evaluate in deciding whether to lift the corporate veil. Rather, English courts will lift the corporate veil of limited liability only when the corporate form is employed for the purposes of fraud or as a device to evade contractual or other legal obligations.").

aiding and abetting fraud. Plaintiffs allege that NatWest Bank, NatWest Finance and NatWest Capital operated as a single economic entity in committing those violations. *See* SAC ¶ 6(i) ("Under the circumstances of this case, any adherence to the fiction of separate corporate existence between NatWest Bank and [NatWest Finance] or [NatWest Capital] would promote injustice and sanction a fraud since NatWest Bank is the true actor and principal in marketing, selling and underwriting the securities."). Although I already have concluded that plaintiffs' allegations against NatWest Finance were plead with the requisite specificity, *see* Opinion, 94 F.Supp.2d at 500–08, plaintiffs also must meet a heightened standard in order to hold NatWest Bank or NatWest Capital liable for those alleged violations.[14]

### i. Single economic entity

 The Second Circuit has summarized the factors to be considered in determining whether a parent and subsidiary are a single economic entity under Delaware law:

> Whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply func-

tioned as a facade for the dominant shareholder.

*Fletcher*, 68 F.3d at 1458 (quoting *Harco National Insurance Co. v. Green Farms, Inc.*, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del.Ch. Sept.19, 1989)). "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces a difficult task. Courts have made it clear that the legal entity of a corporation will not be disturbed until sufficient reason appears." *Fletcher*, 68 F.3d at 1458 (quotation marks and citations omitted).

Plaintiffs plead many specific facts in support of their effort to pierce the corporate veil of NatWest Finance. According to plaintiffs, NatWest Finance was "grossly undercapitalized for the purpose of acting as the initial purchaser and lead underwriter of the Note offering" and NatWest Bank "provided (or was prepared to provide) the funding for the initial purchase of the Notes." SAC ¶ 6(g). In addition, NatWest Finance's participation in the Note offering had to be approved by NatWest Bank's Group Risk Department, which gave its approval subject to certain conditions. *See id.* ¶ 6(e). Moreover, both documents and representatives of the NatWest defendants referred interchangeably to NatWest Finance, NatWest Capital and NatWest Bank. *See id.* ¶ 6(f). Finally, NatWest Finance collected over $400,000,000 from plaintiffs and other investors for the purchase of the Notes, then transferred those funds to a bank account owned by NatWest Bank. *See id.* ¶ 6(g).[15]

---

**14.** In reaching this conclusion, I note that three of the four cases cited by plaintiffs to support the application of Rule 8(a) did not involve allegations of securities fraud. *See Rolls–Royce*, 929 F.Supp. at 121 (complaint listed 23 claims for relief, including common law fraud, negligent misrepresentation, conversion, breach of contract, and RICO violations); *Alter*, 1997 WL 691332, at *2 (complaint asserted fraud, breach of contract, conversion and other claims); *Farley v. Davis*, 91 Civ. 5530, 1992 WL 110753, at *2 (S.D.N.Y. May 8, 1992) (complaint sought to hold plaintiff responsible for contractual obligations). In the fourth case, the Second Circuit rejected defendant's attempt to apply

Rule 9(b) because plaintiff's allegations of securities fraud were unrelated to its veil-piercing claim. *See International Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 & n. 23 (2d Cir. 1974) (individual committed securities fraud and only used corporate structure to shield assets). In this case, by contrast, plaintiffs' securities fraud and veil-piercing claims are inextricably intertwined.

**15.** Plaintiffs also have plead sufficient facts to support their effort to pierce the corporate veil of NatWest Capital, under either English or Delaware law. On information and belief, plaintiffs allege that NatWest Capital "has no on-going or regular business operations, but

Standing alone, plaintiffs' allegation that NatWest Finance required the approval of and funding from NatWest Bank would not support a claim of veil-piercing liability. *See Fletcher,* 68 F.3d at 1459–60 (requiring approval of major transactions "is typical of a majority shareholder or parent corporation."). Viewed as a whole, however, plaintiffs' allegations raise a question as to whether NatWest Finance, NatWest Capital and NatWest Bank operated as a single economic entity. *Compare Mabon,* 1990 WL 44267, at *5–*6 (denying cross-motions for summary judgment on veil-piercing claim due to existence of genuine issues of material fact) *and Harco,* 1989 WL 110537, at *6 (declining to enter a final judgment piercing corporate veil because "several material facts are still in dispute") *with Wallace v. Wood,* 752 A.2d 1175, 1184 (Del.Ch.1999) (granting motion to dismiss veil-piercing claim because "[p]laintiffs merely state that the purpose of the General Partner is to manage and operate the Partnership") *and Akzona Inc. v. E.I. Du Pont De Nemours & Co.,* 607 F.Supp. 227, 238 (D.Del.1984) (declining to pierce corporate veil because "it is undisputed that both Enka and Akzona are significant operating corporations which maintain separate books, observe corporate formalities and possess assets of several hundred million dollars each."). Plaintiffs' allegations are sufficient to raise the veil-piercing claim and give NatWest Bank and NatWest Capital fair notice of the claim against them. *See Acito,* 47 F.3d at 52 ("Rule 9(b) is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.") (quotation marks and citation omitted).

is a corporate form used by NatWest Bank from time to time to engage in high yield financing transactions and other capital market activities." SAC ¶ 6(b). In addition, NatWest Capital was "grossly undercapitalized for the purpose of acting as the initial purchaser and lead underwriter of the Note offer-

### ii. Element of injustice or unfairness

NatWest Bank and NatWest Capital argue that plaintiffs have failed to plead "an overall element of injustice or unfairness." *Fletcher,* 68 F.3d at 1458. Plaintiffs have alleged, however, that the actions of NatWest Finance caused their injuries. *See* Opinion, 94 F.Supp.2d at 506–08. With their veil-piercing claim, plaintiffs allege that NatWest Finance, NatWest Capital and NatWest Bank operated as a single economic entity in carrying out those actions because NatWest Capital and NatWest Finance were "mere instrumentalities and the alter egos of NatWest Bank." SAC ¶ 6(h).

Plaintiffs also allege that they were unaware of the role of NatWest Bank when they purchased the Notes. *See id.* ("The relationship between these entities and the role of NatWest Bank in the underwriting of these notes was not disclosed to the plaintiffs at the time the Notes were sold and was not reasonably discoverable by the plaintiffs before initiation of this action and the production of documents by [NatWest Finance]."). Assuming plaintiffs can establish that NatWest Bank, NatWest Capital and NatWest Finance operated as a single economic entity, failing to pierce the corporate veil would result in an element of injustice or unfairness to plaintiffs. *Cf. Harper v. Delaware Valley Broadcasters, Inc.,* 743 F.Supp. 1076, 1086 (D.Del. 1990) (plaintiff failed to allege any unfairness or injustice where he was aware of corporate arrangements before entering contract and "was not an innocent outsider"), *aff'd,* 932 F.2d 959 (3d Cir.1991).

### c. Conclusion

Plaintiffs have sufficiently alleged a claim for veil-piercing liability, but not

ing" and NatWest Bank "provided (or was prepared to provide) the funding for the initial purchase of the Notes." *Id.* ¶ 6(g). Finally, both documents and representatives of the NatWest defendants referred interchangeably to NatWest Finance, NatWest Capital and NatWest Bank. *See id.* ¶ 6(f).

agency liability, against both NatWest Bank and NatWest Capital. The motions to dismiss plaintiffs' § 10(b) claims must therefore be denied.[16] Plaintiffs are denied leave to amend their agency liability claim because amendment would be futile. *See Acito*, 47 F.3d at 55 ("One good reason to deny leave to amend is when such leave would be futile.").

### 3. State law claims

Because plaintiffs have adequately plead their federal securities fraud claim against NatWest Bank and NatWest Capital, their state law claims for common law fraud against each defendant also must survive the motion to dismiss. *See Scone Investments, L.P. v. American Third Market Corp.*, No. 97 Civ. 3802, 1998 WL 205338, at *10 (S.D.N.Y. Apr.28, 1998) ("[T]he elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b–5.").

NatWest Bank and NatWest Capital both argue that plaintiffs' state law claims for conspiracy to commit fraud and aiding and abetting fraud must be dismissed because the SAC does not allege that either of them knew about the alleged misrepresentations at the time of the Note offering. Because plaintiffs' veil-piercing claim has survived a motion to dismiss, however, NatWest Bank and NatWest Capital are potentially liable for all of the same causes of action as NatWest Finance. *See Thomson–CSF*, 64 F.3d at 777 ("In some instances, the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other."); *see also* 1 *Fletcher Cyclopedia* § 41.10, at 577–78 ("A finding of fact of alter ego ... merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation."). This Court already has ruled that plaintiffs' claims for conspiracy and aiding and abetting against NatWest Finance will not be dismissed. *See* Opinion, 94 F.Supp.2d at 510–11. As a result, those claims also survive against NatWest Bank and NatWest Capital.

### C. Conclusion

By surviving the motions to dismiss, plaintiffs have earned the right to proceed to discovery. *See Wright*, 152 F.3d at 173 ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (quotation marks and citation omitted); *see also* Opinion, 94 F.Supp.2d at 508 ("I note that plaintiffs have merely alleged a set of facts from which a jury reasonably could find that NatWest and McDonald violated section 10(b) and Rule 10b–5.... [P]laintiffs have alleged enough to warrant that discovery proceed.").

In reviewing the motions to dismiss, I have applied the heightened pleading standards contained in Rule 9(b) and the PSLRA. At the same time, I recognize the burden faced by any plaintiffs seeking to plead a claim against defendants whom they believe have defrauded them. Plaintiffs allege that SDI, NatWest Bank, NatWest Capital and others defrauded them into purchasing the Notes by misrepresenting and omitting material facts and by intermingling their corporate structures. In support of those claims, plaintiffs have filed a 61–page complaint full of specific factual assertions. Because complaints need not and should not mimic the length

---

**16.** NatWest Capital also argues that plaintiffs' § 10(b) claim should be dismissed because plaintiffs failed to plead justifiable reliance. I have already rejected that argument as to NatWest Finance. *See* Opinion, 94 F.Supp.2d at 506–08. Because plaintiffs' § 10(b) claim against NatWest Capital is based on veil-piercing liability, NatWest Capital is liable for the misrepresentations made by NatWest Finance if they were operating as a single economic entity. Plaintiffs' allegations of justifiable reliance against NatWest Finance, therefore, also are sufficient to state a claim against NatWest Capital.

and detail of *Den of Thieves* [17], I conclude that plaintiffs have earned the right to proceed to discovery.

## III. CONCLUSION

For the foregoing reasons, the motion to dismiss filed by SDI is DENIED, the motion to dismiss filed by NatWest Capital Markets Limited is DENIED, and the motion to dismiss filed by National Westminster Bank PLC is DENIED.

SO ORDERED.

---

**17.** James B. Stewart, *Den of Thieves* (1992).